QUINN EMANUEL URQUHART &
SULLIVAN, LLP
Karin Kramer (Bar No. 87346)
  karinkramer@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  (650) 801-5000
Facsimile:  (650) 801-5100

David Bilsker (Bar No. 152383)
  davidbilsker@quinnemanuel.com
50 California Street, 22nd Floor
San Francisco, California  94111-4788
Telephone:  (415) 875-6600
Facsimile:  (415) 875-6700

ORIGINAL
FILED

DEC - 2 2010

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

E-filing

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA, SAN JOSE DIVISION

DSM DYNEEMA,

        Plaintiff,

    -against-

BAE SYSTEMS TENSYLON H.P.
MATERIAL, INC.,

        Defendant.

**CV10   5466**

Civil Action No. _____

**COMPLAINT;
DEMAND FOR JURY TRIAL   EDL**

     Plaintiff DSM Dyneema ("DSM"), for its Complaint against Defendant BAE Systems Tensylon H.P. Material, Inc. ("BAE"), alleges as follows:

## PARTIES

    1.    Plaintiff DSM is a corporation organized and existing under the laws of the State of Delaware having a place of business at 1101 Highway 27 South, Stanley, North Carolina 28164. DSM is a leading manufacturer of innovative products and services in the life sciences and materials sciences areas.  DSM's products and services are used globally in a wide range of applications, including life protection and housing, pharmaceuticals, and human and animal nutrition and health.

1     2.     Upon information and belief, Defendant BAE is a corporation organized and

2   existing under the laws of the State of North Carolina having a place of business at 1901 Piedmont

3   Drive, Monroe, North Carolina 28110.

4                           **JURISDICTION AND VENUE**

5     3.     This is a civil action arising under the Declaratory Judgment Act, 28 U.S.C. §§2201

6   and 2202; the Patent Laws of the United States, 35 U.S.C. §1 *et seq.*; the California Business and

7   Professions Code; and common law.

8     4.     This Court has jurisdiction over this action pursuant to 28 U.S.C. §§1331, 1338,

9   and 1367.

10     5.     Venue is proper in this judicial district pursuant to 28 U.S.C. §1391(b).

11     6.     This Court has personal jurisdiction over BAE by virtue of, *inter alia*, its

12   transaction of business and derivation of substantial revenue from services or things used or

13   consumed in this judicial district, its substantial and continuous contacts with this judicial district,

14   its purposeful availment of the rights and benefits of California law, and its commission of tortious

15   acts in this state.  Upon information and belief, BAE engages in the marketing, sale, and/or

16   distribution of products within the United States generally and the State of California specifically.

17                          **INTRADISTRICT ASSIGNMENT**

18     7.     Pursuant to Civil Local Rules 3-2(c) and 3-5(b), this action should be assigned to

19   the San Jose Division.  A substantial portion of the events which give rise to these claims occurred

20   in Morgan Hill, California.  Therefore, assignment to the San Jose Division of this Court is

21   appropriate.

22                                **BACKGROUND**

23     8.     DSM is a leading manufacturer of ballistic protection materials.  DSM markets and

24   sells various ballistic protection products in the United States, including the State of California.

25     9.     DSM manufactures Dyneema®, a super-strong fiber invented by a DSM affiliate

26   and based on ultra high molecular weight polyethylene ("UHMWPE").  In June 2009, DSM began

27   marketing and selling Dyneema® BT10 ("BT10"), the first commercially available product made

28

Complaint; Demand for Jury Trial                    2

1  from a novel, proprietary ballistic UHMWPE tape technology.  BT10 is the first in a new range of

2  ballistic UHMWPE tape products designed to provide vehicles with optimum protection.

3       10.     Since its introduction, DSM has marketed and sold BT10 continuously in the

4  United States, including the State of California.  DSM's customers incorporate BT10 into a variety

5  of finished products used for ballistic protection, including vests, shields, and vehicle armor.

6       11.     BAE is a direct competitor of DSM in the United States, including in California.

7       12.     BAE is the owner of United States Patent No. 7,348,053 ("the '053 patent"),

8  entitled "Ultra High Molecular Weight Polyethylene Ballistic Structures."  The '053 patent issued

9  on March 25, 2008 to BAE as the assignee of the inventors named therein.  A copy of the '053

10  patent is attached hereto as Exhibit A.

11       13.     BAE is also the owner of United States Patent No. 7,470,459 ("the '459 patent"),

12  entitled "Ultra High Molecular Weight Polyethylene Ballistic Structures."  The '459 patent issued

13  on December 30, 2008 to BAE as the assignee of the inventors named therein.  A copy of the '459

14  patent is attached hereto as Exhibit B.

15       14.     On November 5, 2010, DSM received a letter from The Jackson Patent Group ("the

16  Jackson Letter")(attached hereto as Exhibit C).  Upon information and belief, the Jackson Letter

17  was sent on behalf of BAE.  The Jackson Letter stated:

18

19           It is understood that you are supplying BT 10 material to Converters in the United States from your facility in Switzerland.  Our review

20           indicates that you are probably infringing at least Claim 1 of the '459 as a contributory infringer.

21  The Jackson Letter also enclosed copies of both the '459 and '053 patents.

22       15.     On or about November 9, 2010, DSM was advised by a customer that the customer

23  had received a phone call from a BAE employee, followed by a letter from BAE's representative,

24  accusing the customer of infringing the '459 patent by virtue of using DSM's product; that letter

25  also made mention of the '053 patent.  DSM was further advised that a BAE sales representative

26  told that same customer that all of DSM's customers would receive letters stating that DSM's

27  BT10 product infringes BAE's patents.

28

16.     On or about November 12, 2010, Mr. Michael Reynolds, BAE's Vice President of Advanced Materials and Chief Technology Officer for Security & Survivability, held a teleconference with a DSM sales representative.  During that call, Mr. Reynolds stated that DSM's customers in the United States were infringing BAE's patents by virtue of using DSM's BT10 product.  Mr. Reynolds also stated that letters similar to the Jackson Letter had been sent to other customers in the United States.

17.     On or about November 15, 2010, DSM was advised by a second customer that it had received a letter from the Jackson Patent Group stating that the use of BT10 would infringe the '459 patent.  The letter also made mention of the '053 patent.

18.     During this same time period, DSM has been advised that at least two other customers have received the same or similar letters from the Jackson Patent Group, accusing the customers of infringing the '459 patent, and also mentioning the '053 patent, by virtue of using DSM's BT10 product.  One of these customers is Ten Cate, located in Morgan Hill, California.

19.     BAE's letters and verbal threats to DSM and its customers regarding infringement are an unfair business practice that is meant to undermine DSM's business development efforts and chill competition.

## COUNT I
## TRADE LIBEL

20.     DSM incorporates by reference the averments of Paragraphs 1-19 as if fully set forth herein.

21.     As described above, BAE made and published false and defamatory statements to DSM's customers, including but not limited to Ten Cate, concerning alleged infringement of the '053 and '459 patents by DSM with respect to its BT10 product.  Upon information and belief, BAE made and published these statements with the knowledge that they were false, with reckless disregard for the truth of the statements, and with actual malice and intent to injure DSM's reputation.

Complaint; Demand for Jury Trial                4

22.    BAE's statements and misrepresentations are such that a significant portion of the general consuming public or targeted consumers, acting reasonably under the circumstances, will be misled.

23.    BAE's business acts or practices were and are intended to restrain trade in California by preventing DSM from marketing and selling BT10 in this state.

24.    As a direct and proximate result of the publication of these statements by BAE, DSM has suffered substantial damages, including but not limited to pecuniary loss and injury to its reputation.

25.    DSM has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm to its business.

26.    DSM has suffered irreparable injury by reason of the acts, practices, and conduct of BAE described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  DSM has no adequate remedy at law.

**COUNT II**
**DEFAMATION**

27.    DSM incorporates by reference the averments of Paragraphs 1-26 as if fully set forth herein.

28.    BAE's conduct described above constitutes defamation.

29.    Because BAE's statements impute conduct, characteristics, or a condition incompatible with the proper exercise of DSM's lawful business, they are defamatory *per se*, and, therefore, damage to DSM may be presumed.

**COUNT III**
**COMMON LAW UNFAIR COMPETITION**

30.    DSM incorporates by reference the averments of Paragraphs 1-29 as if fully set forth herein.

31.    BAE's conduct described above constitutes common law unfair competition.

32.   BAE's conduct constitutes unfair competition based on, *inter alia*, its misrepresentations concerning alleged infringement of the '053 and '459 patents by DSM.

33.   As described above, BAE's misrepresentations constitute trade libel and defamation.

34.   By reason of BAE's unfair competition, DSM has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm to its business.

35.   DSM has suffered irreparable injury by reason of the acts, practices, and conduct of BAE described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  DSM has no adequate remedy at law.

**COUNT IV**
**CAL. BUS. & PROF. CODE §17200:**
**UNLAWFUL ACTS**

36.   DSM incorporates by reference the averments of Paragraphs 1-35 as if fully set forth herein.

37.   BAE's business acts or practices constitute at least trade libel, defamation, and common law unfair competition.

38.   As a result, BAE's actions violate the unlawfulness prong of Section 17200.

39.   By reason of BAE's unfair competition, DSM has been injured in its business or property, including the loss of past, present, and future profits, the loss of customers and potential customers, the loss of goodwill and product image, and the prospective harm to its business.  DSM also has lost money by virtue of its costs in responding to BAE's untrue allegations, including but not limited to time and resources spent responding to industry concerns and attorneys' fees and costs.

40.   DSM has suffered irreparable injury by reason of the acts, practices, and conduct of BAE described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  DSM has no adequate remedy at law.

**COUNT V**
**CAL. BUS. & PROF. CODE §17200:**
**UNFAIR ACTS**

41.     DSM incorporates by reference the averments of Paragraphs 1-40 as if fully set forth herein.

42.     BAE's business acts or practices were and are intended to restrain trade in California by preventing DSM from marketing and selling BT10 in this state.

43.     BAE's actions thus violate the unfair prong of Section 17200.

**COUNT VI**
**CAL. BUS. & PROF. CODE §17200:**
**DECEPTIVE ACTS**

44.     DSM incorporates by reference the averments of Paragraphs 1-43 as if fully set forth herein.

45.     BAE's statements that DSM and its customers are infringing are untrue and misleading.

46.     Upon information and belief, BAE knew, or by the exercise of reasonable care should have known, that the statements were untrue or misleading.

47.     BAE's statements and misrepresentations are such that a significant portion of the general consuming public or targeted consumers, acting reasonably under the circumstances, will be misled.

48.     DSM has suffered irreparable injury by reason of the acts, practices, and conduct of BAE described above and will continue to suffer such injury unless and until the Court enjoins such acts, practices, and conduct.  DSM has no adequate remedy at law.

**COUNT VII**
**DECLARATORY JUDGMENT OF NONINFRINGEMENT**

49.     DSM incorporates by reference the averments of Paragraphs 1-48 as if fully set forth herein.

50.     An actual and justiciable controversy exists between DSM and BAE, parties having adverse legal interests, concerning the alleged infringement of the '053 and '459 patents by

Complaint; Demand for Jury Trial                    7

DSM's manufacture and sale of BT10. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

51.     DSM's BT10 product does not infringe, either directly or indirectly, any valid claim of the '053 or '459 patents.

52.     DSM is entitled to a judgment declaring that it has never infringed and is not infringing any valid claim of the '053 or '459 patents.

**COUNT VIII**
**DECLARATORY JUDGMENT OF INVALIDITY**

53.     DSM incorporates by reference the averments of Paragraphs 1-52 as if fully set forth herein.

54.     An actual and justiciable controversy exists between DSM and BAE, parties having adverse legal interests, concerning the invalidity of the '053 and '459 patents. This controversy is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

55.     The '053 and '459 patents are invalid under 35 U.S.C. §§102, 103, and/or 112.

56.     DSM is entitled to a judgment declaring that the '053 and '459 patents are invalid.

**PRAYER FOR RELIEF**

**WHEREFORE**, DSM respectfully requests that judgment be entered:

   a.     Declaring that DSM has not infringed and is not infringing the '053 and '459 patents, either directly or indirectly;

   b.     Declaring that the '053 and '459 patents are invalid;

   c.     Finding that BAE's conduct constitutes trade libel;

   d.     Finding that BAE's conduct constitutes defamation;

   e.     Finding that BAE's conduct constitutes unfair competition;

   f.     Finding that BAE has violated section 17200 of the California Business and Professions Code;

   g.     Finding this to be an exceptional case entitling DSM to an award of reasonable attorneys' fees, costs, and expenses as provided by at least 35 U.S.C. §285;

1        h.      Enjoining BAE's continued violations of the California Business and

2    Professions Code as provided by at least California Business and Professions Code §17203;

3        i.      Ordering such restitutionary relief as DSM proves at trial;

4        j.      Pre-judgment and post-judgment interest at the maximum legal rate; and

5        k.      Such other relief as the Court may deem just and proper.

6

7    DATED:  December 2, 2010            By:  [signature]

8                                            David Bilsker (Bar No. 152383)
                                            QUINN EMANUEL URQUHART &
9                                           SULLIVAN, LLP
                                            50 California Street, 22nd Floor
10                                          San Francisco, California  94111-4788
                                            Telephone:  (415) 875-6600
11

12                                          *Attorneys for DSM Dyneema*

13                          **DEMAND FOR JURY TRIAL**

14        Plaintiff DSM Dyneema hereby demands a jury trial on all issues properly tried to a jury.

15

16   DATED:  December 2, 2010            By:  [signature]

17                                          David Bilsker (Bar No. 152383)
                                            QUINN EMANUEL URQUHART &
18                                          SULLIVAN, LLP
                                            50 California Street, 22nd Floor
19                                          San Francisco, California  94111-4788
                                            Telephone:  (415) 875-6600
20

21                                          *Attorneys for DSM Dyneema*

22

23

24

25

26

27

28

Complaint; Demand for Jury Trial                 9

## CERTIFICATION OF INTERESTED PARTIES

Pursuant to Federal Rule of Civil Procedure 7.1, DSM, through its counsel, hereby states that the parent company of DSM is DSM Pharmaceuticals Inc.  No publicly held corporation owns 10% or more of DSM's stock.

Pursuant to Civil L.R. 3-16, the undersigned certifies that the following listed persons, associations of persons, firms, partnerships, corporations (including parent corporations) or other entities (i) have a financial interest in the subject matter in controversy or in a party to the proceeding, or (ii) have a non-financial interest in that subject matter or in a party that could be substantially affected by the outcome of this proceeding:

DSM Pharmaceuticals Inc., the parent company of DSM Dyneema.

DATED:  December 2, 2010        By: _____

David Bilsker (Bar No. 152383)
QUINN EMANUEL URQUHART &
SULLIVAN, LLP
50 California Street, 22nd Floor
San Francisco, California  94111-4788
Telephone:  (415) 875-6600

*Attorneys for DSM Dyneema*

# EXHIBIT A

(12) **United States Patent**     (10) **Patent No.:**     **US 7,348,053 B1**

Weedon et al.     (45) **Date of Patent:**     **Mar. 25, 2008**

(54) **ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES**

(75) Inventors: **Gene C. Weedon**, Richmond, VA (US); **Charles Paul Weber, Jr.**, Monroe, NC (US); **Kenneth C. Harding**, Midlothian, VA (US)

(73) Assignee: **Bae Systems Tensylon H.P. Material, Inc.**, Monroe, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 387 days.

(21) Appl. No.: **11/217,277**

(22) Filed: **Sep. 1, 2005**

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 10/926,681, filed on Aug. 25, 2004, now Pat. No. 6,951,685, which is a division of application No. 09/999,083, filed on Nov. 27, 2001, now abandoned.

(51) **Int. Cl.**
*B32B 27/04* (2006.01)

(52) **U.S. Cl.** ............... **428/297.7**; 2/2.5; 2/5; 428/103; 428/911

(58) **Field of Classification Search** ............ 428/297.7, 428/103, 101, 911; 2/2.5, 5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,424,240 A | * | 1/1984 | Kielbania, Jr. ............ 427/393.5 |
| 5,124,195 A | * | 6/1992 | Harpell et al. ............... 428/152 |
| 2005/0197020 A1* | | 9/2005 | Park et al. .................... 442/36 |
| 2005/0203232 A1* | | 9/2005 | Rolland et al. ............... 524/425 |
| 2006/0286883 A1* | | 12/2006 | Brown et al. ............... 442/135 |

* cited by examiner

*Primary Examiner*—N. Edwards

(57) **ABSTRACT**

Ballistic panels formed by the lamination of highly oriented ultra high molecular weight poly(ethylene) slit films and sheets useful in the fabrication of ballistic containers are described.

**6 Claims, 4 Drawing Sheets**



U.S. Patent

Mar. 25, 2008

Sheet 1 of 4

US 7,348,053 B1



FIG. 1

U.S. Patent     Mar. 25, 2008     Sheet 2 of 4     US 7,348,053 B1



FIG. 2

U.S. Patent

Mar. 25, 2008

Sheet 3 of 4

US 7,348,053 B1



*FIG. 3*



*FIG. 4*

*FIG. 5*

US 7,348,053 B1

# 1

## ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES

This application is a Continuation-in-part of U.S. patent application Ser. No. 10/926,681 (now U.S. Pat. No. 6,951,685) filed Aug. 25, 2004 which was a division of Ser. No. 09/999,083 filed Nov. 27, 2001, abandoned.

### FIELD OF THE INVENTION

The present invention relates to thin tapes of ultra high molecular weight polyethylene fibers and tapes and to methods for their production and more particularly to fabrics woven from such materials that are suitable for use in ballistic structures.

### BACKGROUND OF THE INVENTION

The processing of ultra high molecular weight polyethylene (UHMWPE). i.e. polyethylene having a molecular weight in excess of 5 million, is known in the polymer arts to be extremely difficult. Products made from such materials are, however, very strong, tough and durable.

In the following series of U.S. Patents filed by Kobayashi et al and assigned to Nippon Oil Co., Ltd. a number of inventions related to the fabrication of fibers and films of polyolefins generally and UHMWPE specifically, are described: U.S. Pat. Nos. 4,996,011, 5,002,714, 5,091,133, 5,106,555, 5,200,129, and 5,578,373. The processes described in these patents are depicted schematically in FIG. 1 and generally describe the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compression molding the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. Some of these patents also discuss the fibrillation of the resultant films and slitting of the films to form "fibers". As compression molded, the sheet is relatively friable thus requiring the subsequent stretching or drawing operations to provide an oriented film that exhibits very good strength and durability properties. In fact, the strength of such materials produced by these processes is 3 times that of steel on a weight basis and they exhibit very low creep. The UHMWPE films produced by the processes described in these patents have a final thickness of between 0.003" and 0.012".

While the thus produced materials quite obviously exhibit highly desirable properties, including useful ballistic properties, one of their major shortcomings is their relative stiffness that makes them difficult to "weave" and otherwise process into useful products. When woven, the resulting fabrics also tend to be very stiff and uncomfortable. This stiffness is largely a result of the fact that the films or tapes produced as just described are relatively "thick", i.e. on the order of more than about 3 mils. In order to obtain a material that can be easily woven to provide comfortable clothing and the like, and find use in such other applications as dental floss (another "high strength/thin material application) and high strength "thread" or fiber, it is necessary that the "thickness" of the UHMWPE film be reduced to below 3 mils and preferably below about 2 mils. Subsequent slitting and other treatments, for example fibrillation, can further contribute to the production of such products. Because of the high strength of these materials, it has been thought until now that the best approach to achieve such "thickness

# 2

reduction" was to slit the film of the prior art into narrow strips (on the order of about 10 mils) and to stretch such narrow strips. This has proven largely unsuccessful since the material in such narrow widths will either refuse to stretch or break when elongated under conventional drawing and/or calendering processes. In fact, until the application of the methods described herein, to the best of our knowledge, no attempt to achieve draw ratios greater than 100, as would be necessary to meet the above-described requirements, has been successful. It is well known in the art that at a given thickness, the ballistic performance of an assembly is enhanced by having more layers due to the ability of multiple thinner layers acting in concert function more efficiently in ballistic applications.

It therefore would be most desirable to define a process whereby these high strength materials could be fabricated into films, sheets or tapes and "fibers" that are less than 3 mils and preferably below about 2 mils in thickness. The provision of such a process would open up entirely new applications for these materials in such diverse fields as ballistic structures.

### OBJECTS OF THE INVENTION

It is therefore an object of the present invention to provide a method for the production of UHMWPE films having unique properties that make them amenable for use in structures that have not been possible to fabricate with similar prior art materials.

It is another object of the present invention to provide highly oriented UHMWPE slit film or sheets that can be fabricated into ballistic structures through lamination.

### SUMMARY OF THE INVENTION

According to the present invention, there is provided a method for the production of a novel class of highly oriented slit films, fibers and sheets of highly oriented UHMWPE that are preferably below about 3 mils and more preferably below about 2 mils in thickness. The process involves: compression molding/compacting a very specific class of UHMWPE starting material under very carefully controlled temperature conditions to yield compacted tapes, fibers or sheets; and calendering and/or drawing the tapes, sheets, films or fibers thus produced under controlled tension at a temperature above the melting point of the UHMWPE material. Slitting of the resulting tapes, sheets, films or fibers with a heated knife results in the production of slit film fibers, films, tapes or sheets that find use in ballistic structures when laminated as described herein.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic representation of the production process of the prior art and the thin fiber/film production processes of the present invention.

FIG. 2 is a schematic diagram of the drawing unit used to implement the process of the present invention.

FIG. 3 is a schematic diagram of the calendering unit used to implement the process of the present invention.

FIG. 4 is a cross-sectional view of a film, sheet or tape having an adhesive layer laminated thereto which laminated film, sheet or tape finds use in accordance with the present invention.

FIG. 5 is a cross-sectional view of a laminated composite in accordance with the present invention.

US 7,348,053 B1

| 3 | 4 |

DETAILED DESCRIPTION

The method of the present invention provides a process for the production of a unique class of UHMWPE tapes/sheets/slit films and fibers that are preferably below 3 about mils and more preferably below about 2 mils in thickness. The process involves: compacting a very specific class of UHMWPE starting materials under very carefully controlled temperature conditions to yield compacted sheets: and drawing and calendaring the compacted under careful tension control at a temperature near the onset of melt of the UHMWPE material to produce thin fibers, films, tapes and sheets of UHMPE. Slitting of the resulting tapes, films, sheets or fibers with a heated knife results in such products that find use in such diverse applications as dental floss, personal armor, ballistic structures and sails for sail boats fabricated from woven or laminated materials of these fibers, films, tapes or sheets.

The term "tape" as used herein refers to products having widths on the order of or greater than about ½ inch and preferably greater than 1 inch, of a generally rectangular cross-section and having smooth edges and is specifically used to distinguish from the "fiber" product materials of the prior art of similar UHMWPE composition that were on the order of ⅛ of an inch wide or narrower and contained ragged or serrated edges about their periphery necessitating twisting in any weaving operation as is well known in the weaving arts. The term "slit film fiber" refers specifically to a "fiber" or narrow tape made in accordance with the present invention that exhibits a generally rectangular cross-section and smooth, i.e. non-serrated or ragged edges. The term "sheet" as used herein is meant to refer to thin sections of the materials of the present invention in widths up to and exceeding 160 inches in width as could be produced in large commercial equipment specifically designed for production in such widths and having the same generally rectangular cross-section and smooth edges. Hence, the fundamental difference between a "tape", a "slit film fiber" and a "sheet" as used to describe the products of the processes described herein relates to the width thereof and is generally independent of the thickness thereof.

Referring now to FIG. 1, the processes described in the prior art and depicted schematically in FIG. 1 comprised the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compacting the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. To the extent of their relevance to the modified processes described herein, the aforementioned prior art descriptions are incorporated herein by reference in their entirety.

The fundamental differences between the processes of the prior art and those described herein that result in the production of highly enhanced UHMWPE products begin with the selection of the UHMWPE input material. According to the present invention, the UHMWPE must exhibit high crystallinity (above about 80% as determined by differential scanning calorimetry), a heat of fusion equal to or greater than 220 joules/gram and low levels of entanglement It is critically important to the successful practice of the present invention that the input starting material UHMWPE possess the degree of crystallinity and heat of fusion and meet the low entanglement requirements stated above. Such commercially available materials as Ticona X-168 from Ticona Engineering Polymers, 2600 Updike Road, Auburn Hills

Mich. 48236 and type 1900 CM from Basell Corp. 2801 Centerville Road. Wilmington. Del. 19808 are useful in the successful practice of the present invention.

The second important difference between the process of the present invention and that described in the referenced prior art relates to the compaction step that is performed on the input UHMWPE input material to obtain the product form that forms the starting material for the drawing/calendaring steps. According to the preferred fabrication process of the present invention, the compaction step described in the prior art cited hereinabove is performed at a very carefully controlled temperature range. Since the UHMWPE materials do not exhibit a discrete "melt temperature" in the conventional sense but rather "melt" over a relatively wide temperature range of generally between about 135 (onset of melt) to about 138.5° C. (actual melting in the conventional sense). Hence while the preferred temperature range for compaction is below the melting point of the polymer, compaction can be performed over a temperature range between the onset of melt and melting, a range which will generally be about 4° C. Such a range can be generally described as between about 5 degrees below to about 4 degrees above the onset of melt of the polymer, ~130 to about 137 degrees C., and preferably at a temperature of from 2 degrees below the onset of melt of the polymer to about 1 degree above this temperature. Hence, compacting temperatures of between about 130° C. and about 143° Care generally, but not necessarily, adequate for acceptable compaction depending upon the nature of the UHMWPE powder being so compacted. It should be noted that at higher compaction pressures the operative temperatures for this step can be somewhat lower than those described above. In the prior art, temperature control was not considered particularly critical and the only direction was that it be less than the melting point of the polymer. Compression ratios of from about 3:1 to about 9:1 and preferably between about 6:1 and about 8:1 have been found to yield optimum properties. Compaction in these ranges results in the production of a compacted sheet that is of very uniform density and thickness and suitable for further processing in accordance with the method of the present invention that results in the formation of the optimized products described herein. Compacted sheet exhibiting a density of between about 0.85 g/cm$^3$ and 0.96 g/cm$^3$ is preferred as the compacted sheet starting material for the subsequent drawing and calendaring processes.

Referring now to FIG. 2, the drawing apparatus utilized to achieve the thickness reductions of the compacted sheet produced as just described that result in production of the preferred UHMWPE products of the present invention 10 comprises:

a payoff 12, a godet stand 14 including heated godet rolls 16 (to anneal the product) and nip rolls 18 for establishing and maintaining tension in the line, a first draw zone 20, a first in-line tension sensor 22, a second godet stand 24, a second draw stand 26, a second in-line tension sensor 28, a third godet stand 30 and according to the preferred embodiment, a fibrillation unit 32, a nip roll stand 34 for maintaining tension and godet station 36 comprised of unheated take-up rolls 38. As seen from FIG. 1, the input or starting material of this process is generally the thick, compressed and rolled but unoriented product of the compaction step of the modified and carefully controlled prior art production process, modified as to the input UHMWPE and compacting conditions, as described above, that exhibits a thickness on the order of 10 mils or more. The input or starting material in the drawing/calendaring process steps described below is,

5

of course, somewhat more sophisticated and narrowly defined in view of the native polymer input property requirements, i.e. degree of crystallinity, heat of fusion and low entanglement as is the compaction process that involves significantly more carefully controlled temperature conditions.

Each of the elements of the apparatus just described and utilized in the successful practice of the present invention are well known in the film and fiber drawing arts as is their combination in a line of the type just described. Consequently, no detailed description of such a line is required or will be made herein and the reader is referred to the numerous design manuals and descriptions of such apparatus commonly available in the art.

Similarly, the calendering apparatus depicted in FIG. 2 and described below requires no description beyond that presented immediately below as each of its elements and the combination thereof are well known in the fiber and film calendering arts and easily constructed in accordance with that general knowledge.

Referring now to FIG. 2, the calendering apparatus 40 useful in the production of the UHMWPE materials described herein comprises:

an unwind or payoff station 42, a tension control device 44, a preheat section 46, a pair of heated calender rolls 48, a second tension control section 50 and a rewind or take-up station 52. Preheat section 46 heats the input material to the temperatures described below prior to entry of the input material into calender roll pair 48. Calender rolls 48 are heated to impart the operating temperatures indicated below to the preheated input material and rotate the direction of arrows 54 shown in FIG. 3. The thickness of the UHMWPE product produced by calendering in the equipment depicted in FIG. 3 will, of course be dictated by the gap at nip 56 between calender rolls 48. Such gap can be controlled by either setting a fixed gap to produce product of the desired thickness or by applying a controlled pressure in nip 56.

While the calendering equipment just described is similarly generally old and well known in the prior art, the operation of same in the production of the UHMWPE films and fibers of the present invention is new and forms one core element of the process aspect of the present invention.

Thus according to the present invention, input material comprising an UHMWPE "tape", "sheet" or "fiber" as produced in the modified prior art production processes described hereinabove, i.e. modified as to input material and temperature control is introduced into a drawing and calendering apparatus of the type just described and depicted in FIGS. 2 and 3. In the case of the drawing operation, the input material can be a "tape" having a width greater than about ⅛" and preferably in the range of 2.5 to about 3.0 inches, but it could be much wider given the availability of commercial equipment adequate in scale and power to perform the required operations. In the calendering operation, the input material is generally a "fiber" having a width below about ⅛". In either process, the input material described above is first preheated to a temperature near the onset of melt as described above, and drawing and calendering is accomplished by the application of 1) constant and controlled tension in the case of the drawing operation and 2) pressure with controlled tension in the case of the calendering operation at temperatures of between slightly below or above the onset of melt as previously described. Drawing is preferably performed at a temperature of between about 140° C. and about 158° C. and most preferably between about 148° C. and about 150° C. for commercially available UHMWPE compacted powders although variations in the UHMWPE

6

compositions utilized as starting materials may allow for alteration of these temperature ranges. At temperature levels below the previously defined ranges, no significant thickness reduction will occur, while at temperatures above these ranges the material will tend to separate in the drawing and calendering operations. Calendering can in fact be performed over a very wide temperature range with the calendaring rolls at temperatures from ambient to well above the actual melt temperature of the polymer depending upon such variables as equipment capabilities such as speed of calendaring, pressure applied, etc. The only true limitation being that the compacted and drawn sheet not melt during calendering.

Maintaining a controlled tension of between about 0.5 and about 5 g/denier, and preferably between about 0.8 and 3 g/denier is also important to the production of product having the required "thinness" specified herein. Denier as used herein is defined as the weight in grams of 9000 meters of the product film, sheet or fiber, during drawing and calendering, is also highly important to the successful production of a suitable product having the required "thinness" specified herein. At tension levels below 0.5 g/denier no significant drawing or reduction will be obtained while at tension levels above about 5 g/denier the material will tend to separate. In the case of drawing, tension is a function of the feed polymer and can vary broadly depending thereon and the ranges just specified refer to shoes found useful with particular commercial starting materials. The UHMWPE films, sheets, fibers or tapes produced by the process just described exhibit heats of fusion at or above about 243 joules/gram.

Total reductions achieved during drawing and calendaring will generally be between about 50:1 and about 170:1 or more depending again upon the input raw material and the end use to which the product is to be applied. Such total drawing and calendaring is computed as the multiple of each of the individual reductions achieved by each of the combined process steps.

After thickness reduction by calendering and/or drawing in the apparatus shown in FIGS. 2 and 3 and according to the processing parameters just described, various additional operations can be performed to make the product suitable for the various product applications described below,

For example, as shown in FIG. 2, the drawing line or apparatus 10 may include a fibrillation roll or other apparatus for purposes of introducing short slits across the width of the product film, sheet or fiber. Fibrillation and the equipment used to produce it are both well known in the art and, in fact, were used in the prior art production processes. Fibrillation while often incorporated into the production lines for the materials described herein is not essential to the successful practice of the present invention. The tape, sheet, film or fiber output of the drawing and calendering processes can be slit to an appropriate width for the production of fibers and then subsequently fibrillated. As described below, special slitting treatments provide even more unique products.

As will be apparent to the skilled artisan, combinations of the calendering and drawing processes within the parameters described herein can easily be envisioned, and such combinations are intended to be within the scope of the appended claims.

As discussed hereinafter, the provision of smooth edges on the tape, sheet, film and fiber products described herein provides significant advantages over similar prior art products. The attainment of such smooth edges that result in many of the enhanced products described herein and the

7

generally rectangular cross-section of such products can only be achieved using the slitting techniques described below. The use of conventional slitting knives as are used in the art in the production of, for example blown films, and as were used in the slitting portion of the prior art processes described above, while suitable for the production of fibers, sheets, tapes and films in accordance with the present invention have a major shortcoming in that they leave a serrated surface at the point of slitting. This serration can result in the generation of stress risers that weaken the laminates described hereinafter when they are applied in ballistic applications. Accordingly, it has been discovered that the use of heated slitting knives, heated to a temperature of above the melting point of the UHMWPE, i.e. above about 141°-142° C. must be used to provide an even or smooth surface suitable for use in ballistic structures and laminates. The application of the process just described in combination with slitting using heated knives results in the production of highly oriented ultra high molecular weight polyethylene slit film fibers, tapes, sheets and films that are of a generally rectangular cross-section and have smooth cut edges.

The production of laminated structures produced by laminating a plurality of layers of films or sheets of these materials either directly to each other or through the mechanism of an adhesive of one type or another, also provide products exhibiting desirable ballistic properties.

Referring now to FIGS. 4 and 5 attached hereto, FIG. 4 depicts a cross-section of a composite sheet material suitable for lamination in accordance with the present invention. As shown in FIG. 4 such a composite sheet **58** comprises a sheet **60** of UHMWPE material fabricated in accordance with the present invention having a layer of a sheet adhesive **62** laminated thereto. Such a sheet adhesive may comprise, for example, a layer of high density polyethylene having a thickness on the order of, for example 30μ, and exhibiting a melting point lower than that of the UHMWPE so that no weakening of the UHMWPE occurs during subsequent lamination operations as described below. Exposure of the UHMWPE sheet may result in diminution of the ballistics properties thereof. It is to be noted that, while a sheet adhesive forms one preferred embodiment of a method of joining sheets of UHMWPE in the laminated fabrics described below, other adhesive materials capable of joining alternating sheets of UHMWPE may be substituted therefore. These include for example vinyl ester adhesives, flexible epoxies etc. that could be similarly used. In point of fact, fabrics of alternating layers of the UHMWPE materials described herein can be laminated without adhesive by the simple step of applying even relatively low pressures of from about 5-10 psi up to over 150 psi while heating layers of the UHMWPE sheet to a point near the softening point of the material or about 152 degrees C.

FIG. 5 depicts a cross-sectional view of a laminated structure or panel **68** fabricated in accordance with the present invention utilizing the laminated composite shown in FIG. 4. As will be apparent to the skilled artisan, it is highly desirable that the alternating sheets of UHMWPE **60** be cross oriented, i.e. be laminated in alternating directions due to the significant orientation of these sheets induced by the drawing and/or calendaring operations described above and the consequent relative directional character of their various properties.

The ballistic properties/performance of UHMWPE materials, in particular the gel spun versions of such materials produced by Honeywell International, Richmond, Va. and

8

sold under the trademark Spectra®, have been studied and reported widely. The ballistic performance of the materials described herein that can be produced at a significantly lower cost than the gel spun Spectra® fibers will be about equivalent to these prior art UHMWPE materials, but available at significantly lower cost due to the significantly reduced cost of their production. The strain rate sensitivity of these materials, i.e. their property of becoming stronger the faster strain is applied thereto, makes them particularly useful in ballistic applications where large strains are applied very quickly by an incoming threat.

Ballistic panels as claimed hereinafter are fabricated as just described by laminating a plurality of layers of the sheet/films described above, preferably in alternating orientations, and, of course need to be self-supporting in order to be practical for use as ballistic containers, buildings etc., i.e. closed structures, capable of withstanding ballistic forces whether addressed from within the structure (containment) or outside of the structure (protection). Self-supporting panels suitable for the construction/assembly of ballistic structures are generally, but need not be, above about ¼ inch and preferably above about ½ inch in thickness to provide basic levels of ballistic resistance and at least minimal structural strength when appropriately assembled into a container or building in a conventional fashion. There is no practical upper limit to the thickness of such panels except as may be imposed by the particular application or the ability to fabricate a certain thickness.

While it is theoretically possible to fabricate the ballistic panels described herein from the tapes or slit film fibers described hereinabove, it is probably cost prohibitive to do so, but such ballistic panels fabricated from these starting materials are intended to be within the scope of the appended claims.

There have thus been described a novel class of laminates made from UHMWPE slit films, tapes, or sheets that can be fabricated into laminated panels suitable for the construction of protective or containment structures.

As the invention has been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the appended claims.

What is claimed is:

**1.** A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit film fibers having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

**2.** The ballistic panel of claim **1** wherein said ultra high molecular weight polyethylene slit film fibers have a thickness below about 3 mils.

**3.** The ballistic panel of claim **1** having a thickness above about ¼ inch.

**4.** The ballistic panel of claim **3** having a thickness above about ½ inch.

**5.** The ballistic panel of claim **3** comprising a plurality of individual layers of a highly oriented ultra high molecular weight polyethylene slit film fiber laminated directly to each other without an adhesive mechanism.

**6.** The ballistic panel of claim **3** comprising individual layers of a highly oriented ultra high molecular weight polyethylene slit film fiber laminated directly to each other with an adhesive mechanism.

*   *   *   *   *

# EXHIBIT B

US007470459B1

(12) **United States Patent**　　(10) **Patent No.:**　**US 7,470,459 B1**
Weedon et al.　　(45) **Date of Patent:**　**Dec. 30, 2008**

(54) **ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES**

(75) Inventors: **Gene C. Weedon**, Richmond, VA (US);
**Charles Paul Weber, Jr.**, Monroe, NC (US); **Kenneth C. Harding**, Midlothian, VA (US)

(73) Assignee: **BAE Systems Tensylon H.P.M., Inc.**, Monroe, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/012,271**

(22) Filed: **Feb. 1, 2008**

**Related U.S. Application Data**

(60) Continuation of application No. 11/217,277, filed on Sep. 1, 2005, now Pat. No. 7,348,053, which is a continuation-in-part of application No. 10/926,681, filed on Aug. 25, 2004, now Pat. No. 6,951,685, which is a division of application No. 09/999,083, filed on Nov. 27, 2001, now abandoned.

(51) **Int. Cl.**
*B32B 3/06*　　(2006.01)

(52) **U.S. Cl.** .................. 428/103; 428/297.7; 428/911
(58) **Field of Classification Search** ............... 428/103, 428/297.7, 911; 2/2.5, 5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 4,709,850 A | * | 12 1987 | Wagner | 229/303 |
| 5,093,197 A | * | 3 1992 | Howard et al. | 428/372 |
| 5,578,373 A | * | 11 1996 | Kobayashi et al. | 428/364 |
| 6,951,685 B1 | * | 10 2005 | Weedon et al. | 428/364 |
| 7,348,053 B1 | * | 3 2008 | Weedon et al. | 428/297.7 |
| 2002/0049269 A1 | * | 4 2002 | HO et al. | 524/186 |
| 2002/0132923 A1 | * | 9 2002 | Langohr et al. | 525/191 |
| 2005/0197020 A1 | * | 9 2005 | Park et al. | 442/36 |
| 2005/0203232 A1 | * | 9 2005 | Rolland et al. | 524/425 |

* cited by examiner

*Primary Examiner*—N. Edwards

(57) **ABSTRACT**

Ballistic panels formed by the lamination of highly oriented ultra high molecular weight poly(ethylene) slit films and sheets useful in the fabrication of ballistic containers are described.

**12 Claims, 4 Drawing Sheets**



U.S. Patent

Dec. 30, 2008

Sheet 1 of 4

US 7,470,459 B1



FIG. 1

U.S. Patent

Dec. 30, 2008

Sheet 2 of 4

US 7,470,459 B1



FIRST DRAW ZONE

SECOND DRAW ZONE

FIBRILLATION & ANNEALING

10

FIG. 2

U.S. Patent

Dec. 30, 2008

Sheet 3 of 4

US 7,470,459 B1



FIG. 3



*FIG. 4*

*FIG. 5*

US 7,470,459 B1

1

**ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES**

This application is a Continuation of U.S. patent application Ser. No. 11/217,277 filed Sep. 1, 2005 and now U.S. Pat. No. 7,348,053 which is a Continuation-in-part of U.S. patent application Ser. No. 10/926,681, filed Aug. 25, 2004 and now U.S. Pat. No. 6,951,685 which was a division of Ser. No. 09/999,083 filed Nov. 27, 2001, abandoned.

FIELD OF THE INVENTION

The present invention relates to thin tapes of ultra high molecular weight polyethylene fibers and tapes and to methods for their production and more particularly to fabrics woven from such materials that are suitable for use in ballistic structures.

BACKGROUND OF THE INVENTION

The processing of ultra high molecular weight polyethylene (UHMWPE), i.e. polyethylene having a molecular weight in excess of 5 million, is known in the polymer arts to be extremely difficult. Products made from such materials are, however, very strong, tough and durable.

In the following series of U.S. patents filed by Kobayashi et al and assigned to Nippon Oil Co., Ltd. a number of inventions related to the fabrication of fibers and films of polyolefins generally and UHMWPE specifically, are described: U.S. Pat. Nos. 4,996,011, 5,002,714, 5,091,133, 5,106,555, 5,200,129, and 5,578,373. The processes described in these patents are depicted schematically in FIG. 1 and generally describe the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compression molding the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. Some of these patents also discuss the fibrillation of the resultant films and slitting of the films to form "fibers". As compression molded, the sheet is relatively friable thus requiring the subsequent stretching or drawing operations to provide an oriented film that exhibits very good strength and durability properties. In fact, the strength of such materials produced by these processes is 3 times that of steel on a weight basis and they exhibit very low creep. The UHMWPE films produced by the processes described in these patents have a final thickness of between 0.003" and 0.012".

While the thus produced materials quite obviously exhibit highly desirable properties, including useful ballistic properties, one of their major shortcomings is their relative stiffness that makes them difficult to "weave" and otherwise process into useful products. When woven, the resulting fabrics also tend to be very stiff and uncomfortable. This stiffness is largely a result of the fact that the fibers or tapes produced as just described are relatively "thick", i.e. on the order of more than about 3 mils. In order to obtain a material that can be easily woven to provide comfortable clothing and the like, and find use in such other applications as dental floss (another "high strength/thin material application) and high strength "thread" or fiber, it is necessary that the "thickness" of the UHMWPE film be reduced to below 3 mils and preferably below about 2 mils. Subsequent slitting and other treatments, for example fibrillation, can further contribute to the production of such products. Because of the high strength of these materials, it has been thought until now that the best approach

2

to achieve such "thickness reduction" was to slit the film of the prior art into narrow strips (on the order of about 10 mils) and to stretch such narrow strips. This has proven largely unsuccessful since the material in such narrow widths will either refuse to stretch or break when elongated under conventional drawing and/or calendering processes. In fact, until the application of the methods described herein, to the best of our knowledge, no attempt to achieve draw ratios greater than 100, as would be necessary to meet the above-described requirements, has been successful. It is well known in the art that at a given thickness, the ballistic performance of an assembly is enhanced by having more layers due to the ability of multiple thinner layers acting in concert function more efficiently in ballistic applications.

It therefore would be most desirable to define a process whereby these high strength materials could be fabricated into films, sheets or tapes and "fibers" that are less than 3 mils and preferably below about 2 mils in thickness. The provision of such a process would open up entirely new applications for these materials in such diverse fields as ballistic structures.

OBJECTS OF THE INVENTION

It is therefore an object of the present invention to provide a method for the production of UHMWPE films having unique properties that make them amenable for use in structures that have not been possible to fabricate with similar prior art materials.

It is another object of the present invention to provide highly oriented UHMWPE slit film or sheets that can be fabricated into ballistic structures through lamination.

SUMMARY OF THE INVENTION

According to the present invention, there is provided a method for the production of a novel class of highly oriented slit films, fibers and sheets of highly oriented UHMWPE that are preferably below about 3 mils and more preferably below about 2 mils in thickness. The process involves: compression molding/compacting a very specific class of UHMWPE starting material under very carefully controlled temperature conditions to yield compacted tapes, fibers or sheets; and calendering and/or drawing the tapes, sheets, films or fibers thus produced under controlled tension at a temperature above the melting point of the UHMWPE material. Slitting of the resulting tapes, sheets, films or fibers with a heated knife results in the production of slit film fibers, films, tapes or sheets that find use in ballistic structures when laminated as described herein.

DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic representation of the production process of the prior art and the thin fiber/film production processes of the present invention.

FIG. 2 is a schematic diagram of the drawing unit used to implement the process of the present invention.

FIG. 3 is a schematic diagram of the calendering unit used to implement the process of the present invention.

FIG. 4 is a cross-sectional view of a film, sheet or tape having an adhesive layer laminated thereto which laminated film, sheet or tape finds use in accordance with the present invention.

FIG. 5 is a cross-sectional view of a laminated composite in accordance with the present invention.

US 7,470,459 B1

| 3 | 4 |

DETAILED DESCRIPTION

The method of the present invention provides a process for the production of a unique class of UHMWPE tapes/sheets/slit films and fibers that are preferably below 3 about mils and more preferably below about 2 mils in thickness. The process involves: compacting a very specific class of UHMWPE starting materials under very carefully controlled temperature conditions to yield compacted sheets; and drawing and calendaring the compacted under careful tension control at a temperature near the onset of melt of the UHMWPE material to produce thin fibers, films, tapes and sheets of UHMPE. Slitting of the resulting tapes, films, sheets or fibers with a heated knife results in such products that find use in such diverse applications as dental floss, personal armor, ballistic structures and sails for sail boats fabricated from woven or laminated materials of these fibers, films, tapes or sheets.

The term "tape" as used herein refers to products having widths on the order of or greater than about ½ inch and preferably greater than 1 inch, of a generally rectangular cross-section and having smooth edges and is specifically used to distinguish from the "fiber" product materials of the prior art of similar UHMWPE composition that were on the order of ⅛ of an inch wide or narrower and contained ragged or serrated edges about their periphery necessitating twisting in any weaving operation as is well known in the weaving arts. The term "slit film fiber" refers specifically to a "fiber" or narrow tape made in accordance with the present invention that exhibits a generally rectangular cross-section and smooth, i.e. non-serrated or ragged edges. The term "sheet" as used herein is meant to refer to thin sections of the materials of the present invention in widths up to and exceeding 160 inches in width as could be produced in large commercial equipment specifically designed for production in such widths and having the same generally rectangular cross-section and smooth edges. Hence, the fundamental difference between a "tape", a "slit film fiber" and a "sheet" as used to describe the products of the processes described herein relates to the width thereof and is generally independent of the thickness thereof.

Referring now to FIG. 1, the processes described in the prior art and depicted schematically in FIG. 1 comprised the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compacting the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. To the extent of their relevance to the modified processes described herein, the aforementioned prior art descriptions are incorporated herein by reference in their entirety.

The fundamental differences between the processes of the prior art and those described herein that result in the production of highly enhanced UHMWPE products begin with the selection of the UHMWPE input material. According to the present invention, the UHMWPE must exhibit high crystallinity (above about 80% as determined by differential scanning calorimetry), a heat of fusion equal to or greater than 220 joules/gram and low levels of entanglement. It is critically important to the successful practice of the present invention that the input starting material UHMWPE possess the degree of crystallinity and heat of fusion and meet the low entanglement requirements stated above. Such commercially available materials as Ticona X-168 from Ticona Engineering Polymers, 2600 Updike Road, Auburn Hills MI 48236 and type 1900 CM from Basell Corp. 2801 Centerville Road. Wilmington, Del. 19808 are useful in the successful practice of the present invention.

The second important difference between the process of the present invention and that described in the referenced prior art relates to the compaction step that is performed on the input UHMWPE input material to obtain the product form that forms the starting material for the drawing/calendaring steps. According to the preferred fabrication process of the present invention, the compaction step described in the prior art cited hereinabove is performed at a very carefully controlled temperature range. Since the UHMWPE materials do not exhibit a discrete "melt temperature" in the conventional sense but rather "melt" over a relatively wide temperature range of generally between about 135 (onset of melt) to about 138.5° C. (actual melting in the conventional sense). Hence while the preferred temperature range for compaction is below the melting point of the polymer, compaction can be performed over a temperature range between the onset of melt and melting, a range which will generally be about 4° C. Such a range can be generally described as between about 5 degrees below to about 4 degrees above the onset of melt of the polymer, ~130 to about 137 degrees C., and preferably at a temperature of from 2 degrees below the onset of melt of the polymer to about 1 degree above this temperature. Hence, compacting temperatures of between about 130° C. and about 143° C. are generally, but not necessarily, adequate for acceptable compaction depending upon the nature of the UHMWPE powder being so compacted. It should be noted that at higher compaction pressures the operative temperatures for this step can be somewhat lower than those described above. In the prior art, temperature control was not considered particularly critical and the only direction was that it be less than the melting point of the polymer. Compression ratios of from about 3:1 to about 9:1 and preferably between about 6:1 and about 8:1 have been found to yield optimum properties. Compaction in these ranges results in the production of a compacted sheet that is of very uniform density and thickness and suitable for further processing in accordance with the method of the present invention that results in the formation of the optimized products described herein. Compacted sheet exhibiting a density of between about 0.85 g/cm³ and 0.96 g/cm³ is preferred as the compacted sheet starting material for the subsequent drawing and calendaring processes.

Referring now to FIG. 2, the drawing apparatus utilized to achieve the thickness reductions of the compacted sheet produced as just described that result in production of the preferred UHMWPE products of the present invention 10 comprises:

a payoff 12, a godet stand 14 including heated godet rolls 16 (to anneal the product) and nip rolls 18 for establishing and maintaining tension in the line, a first draw zone 20, a first in-line tension sensor 22, a second godet stand 24, a second draw stand 26, a second in-line tension sensor 28, a third godet stand 30 and according to the preferred embodiment, a fibrillation unit 32, a nip roll stand 34 for maintaining tension and godet station 36 comprised of unheated take-up rolls 38. As seen from FIG. 1, the input or starting material of this process is generally the thick, compressed and rolled but unoriented product of the compaction step of the modified and carefully controlled prior art production process, modified as to the input UHMWPE and compacting conditions, as described above, that exhibits a thickness on the order of 10 mils or more. The input or starting material in the drawing/calendaring process steps described below is, of course, somewhat more sophisticated and narrowly defined in view of the native polymer input property requirements, i.e. degree

US 7,470,459 B1

5

of crystallinity, heat of fusion and low entanglement as is the compaction process that involves significantly more carefully controlled temperature conditions.

Each of the elements of the apparatus just described and utilized in the successful practice of the present invention are well known in the film and fiber drawing arts as is their combination in a line of the type just described. Consequently, no detailed description of such a line is required or will be made herein and the reader is referred to the numerous design manuals and descriptions of such apparatus commonly available in the art.

Similarly, the calendering apparatus depicted in FIG. 2 and described below requires no description beyond that presented immediately below as each of its elements and the combination thereof are well known in the fiber and film calendering arts and easily constructed in accordance with that general knowledge.

Referring now to FIG. 2, the calendering apparatus 40 useful in the production of the UHMWPE materials described herein comprises:

an unwind or payoff station 42, a tension control device 44, a preheat section 46, a pair of heated calender rolls 48, a second tension control section 50 and a rewind or take-up station 52. Preheat section 46 heats the input material to the temperatures described below prior to entry of the input material into calender roll pair 48. Calender rolls 48 are heated to impart the operating temperatures indicated below to the preheated input material and rotate the direction of arrows 54 shown in FIG. 3. The thickness of the UHMWPE product produced by calendering in the equipment depicted in FIG. 3 will, of course be dictated by the gap at nip 56 between calender rolls 48. Such gap can be controlled by either setting a fixed gap to produce product of the desired thickness or by applying a controlled pressure in nip 56.

While the calendering equipment just described is similarly generally old and well known in the prior art, the operation of same in the production of the UHMWPE films and fibers of the present invention is new and forms one core element of the process aspect of the present invention.

Thus according to the present invention, input material comprising an UHMWPE "tape", "sheet" or "fiber" as produced in the modified prior art production processes described hereinabove, i.e. modified as to input material and temperature control is introduced into a drawing and calendering apparatus of the type just described and depicted in FIGS. 2 and 3. In the case of the drawing operation, the input material can be a "tape" having a width greater than about 1/8" and preferably in the range of 2.5 to about 3.0 inches, but it could be much wider given the availability of commercial equipment adequate in scale and power to perform the required operations. In the calendering operation, the input material is generally a "fiber" having a width below about 1/8". In either process, the input material described above is first preheated to a temperature near the onset of melt as described above, and drawing and calendering is accomplished by the application of 1) constant and controlled tension in the case of the drawing operation and 2) pressure with controlled tension in the case of the calendering operation at temperatures of between slightly below or above the onset of melt as previously described. Drawing is preferably performed at a temperature of between about 140° C. and about 158° C. and most preferably between about 148° C. and about 150° C. for commercially available UHMWPE compacted powders although variations in the UHMWPE compositions utilized as starting materials may allow for alteration of these temperature ranges. At temperature levels below the previously defined ranges, no significant thickness reduction will occur,

6

while at temperatures above these ranges the material will tend to separate in the drawing and calendering operations. Calendering can in fact be performed over a very wide temperature range with the calendaring rolls being at temperatures from ambient to well above the actual melt temperature of the polymer depending upon such variables as equipment capabilities such as speed of calendaring, pressure applied, etc. The only true limitation being that the compacted and drawn sheet not melt during calendering.

Maintaining a controlled tension of between about 0.5 and about 5 g/denier, and preferably between about 0.8 and 3 g/denier is also important to the production of product having the required "thinness" specified herein. Denier as used herein is defined as the weight in grams of 9000 meters of the product film, sheet or fiber, during drawing and calendering, is also highly important to the successful production of a suitable product having the required "thinness" specified herein. At tension levels below 0.5 g/denier no significant drawing or reduction will be obtained while at tension levels above about 5 g/denier the material will tend to separate. In the case of drawing, tension is a function of the feed polymer and can vary broadly depending thereon and the ranges just specified refer to shoes found useful with particular commercial starting materials. The UHMWPE films, sheets, fibers or tapes produced by the process just described exhibit heats of fusion at or above about 243 joules/gram.

Total reductions achieved during drawing and calendaring will generally be between about 50:1 and about 170:1 or more depending again upon the input raw material and the end use to which the product is to be applied. Such total drawing and calendaring is computed as the multiple of each of the individual reductions achieved by each of the combined process steps.

After thickness reduction by calendering and/or drawing in the apparatus shown in FIGS. 2 and 3 and according to the processing parameters just described, various additional operations can be performed to make the product suitable for the various product applications described below.

For example, as shown in FIG. 2, the drawing line or apparatus 10 may include a fibrillation roll or other apparatus for purposes of introducing short slits across the width of the product film, sheet or fiber. Fibrillation and the equipment used to produce it are both well known in the art and, in fact, were used in the prior art production processes. Fibrillation while often incorporated into the production lines for the materials described herein is not essential to the successful practice of the present invention. The tape, sheet, film or fiber output of the drawing and calendering processes can be slit to an appropriate width for the production of fibers and then subsequently fibrillated. As described below, special slitting treatments provide even more unique products.

As will be apparent to the skilled artisan, combinations of the calendering and drawing processes within the parameters described herein can easily be envisioned, and such combinations are intended to be within the scope of the appended claims.

As discussed hereinafter, the provision of smooth edges on the tape, sheet, film and fiber products described herein provides significant advantages over similar prior art products. The attainment of such smooth edges that result in many of the enhanced products described herein and the generally rectangular cross-section of such products can only be achieved using the slitting techniques described below. The use of conventional slitting knives as are used in the art in the production of, for example blown films, and as were used in the slitting portion of the prior art processes described above, while suitable for the production of fibers, sheets, tapes and

US 7,470,459 B1

7

films in accordance with the present invention have a major shortcoming in that they leave a serrated surface at the point of slitting. This serration can result in the generation of stress risers that weaken the laminates described hereinafter when they are applied in ballistic applications. Accordingly, it has been discovered that the use of heated slitting knives, heated to a temperature of above the melting point of the UHMWPE, i.e. above about 141°-142° C. must be used to provide an even or smooth surface suitable for use in ballistic structures and laminates. The application of the process just described in combination with slitting using heated knives results in the production of highly oriented ultra high molecular weight polyethylene slit film fibers, tapes, sheets and films that are of a generally rectangular cross-section and have smooth cut edges.

The production of laminated structures produced by laminating a plurality of layers of films or sheets of these materials either directly to each other or through the mechanism of an adhesive of one type or another, also provide products exhibiting desirable ballistic properties.

Referring now to FIGS. 4 and 5 attached hereto, FIG. 4 depicts a cross-section of a composite sheet material suitable for lamination in accordance with the present invention. As shown in FIG. 4 such a composite sheet 58 comprises a sheet 60 of UHMWPE material fabricated in accordance with the present invention having a layer of a sheet adhesive 62 laminated thereto. Such a sheet adhesive may comprise, for example, a layer of high density polyethylene having a thickness on the order of, for example 30μ, and exhibiting a melting point lower than that of the UHMWPE so that no weakening of the UHMWPE occurs during subsequent lamination operations as described below. Exposure of the UHMWPE sheet may result in diminution of the ballistics properties thereof. It is to be noted that, while a sheet adhesive forms one preferred embodiment of a method of joining sheets of UHMWPE in the laminated fabrics described below, other adhesive materials capable of joining alternating sheets of UHMWPE may be substituted therefore. These include for example vinyl ester adhesives, flexible epoxies etc. that could be similarly used. In point of fact, fabrics of alternating layers of the UHMWPE materials described herein can be laminated without adhesive by the simple step of applying even relatively low pressures of from about 5-10 psi up to over 150 psi while heating layers of the UHMWPE sheet to a point near the softening point of the material or about 152 degrees C.

FIG. 5 depicts a cross-sectional view of a laminated structure or panel 68 fabricated in accordance with the present invention utilizing the laminated composite shown in FIG. 4. As will be apparent to the skilled artisan, it is highly desirable that the alternating sheets of UHMWPE 60 be cross oriented, i.e. be laminated in alternating directions due to the significant orientation of these sheets induced by the drawing and/or calendaring operations described above and the consequent relative directional character of their various properties.

The ballistic properties/performance of UHMWPE materials, in particular the gel spun versions of such materials produced by Honeywell International, Richmond, Va. and sold under the trademark Spectra®, have been studied and reported widely. The ballistic performance of the materials described herein that can be produced at a significantly lower cost than the gel spun Spectra® fibers will be about equivalent to these prior art UHMWPE materials, but available at significantly lower cost due to the significantly reduced cost of their production. The strain rate sensitivity of these materials, i.e. their property of becoming stronger the faster strain is

8

applied thereto, makes them particularly useful in ballistic applications where large strains are applied very quickly by an incoming threat.

Ballistic panels as claimed hereinafter are fabricated as just described by laminating a plurality of layers of the sheet/films described above, preferably in alternating orientations, and, of course need to be self-supporting in order to be practical for use as ballistic containers, buildings etc., i.e. closed structures, capable of withstanding ballistic forces whether addressed from within the structure (containment) or outside of the structure (protection). Self-supporting panels suitable for the construction/assembly of ballistic structures are generally, but need not be, above about ¼ inch and preferably above about ½ inch in thickness to provide basic levels of ballistic resistance and at least minimal structural strength when appropriately assembled into a container or building in a conventional fashion. There is no practical upper limit to the thickness of such panels except as may be imposed by the particular application or the ability to fabricate a certain thickness.

While it is theoretically possible to fabricate the ballistic panels described herein from the tapes or slit film fibers described hereinabove, it is probably cost prohibitive to do so, but such ballistic panels fabricated from these starting materials are intended to be within the scope of the appended claims.

There have thus been described a novel class of laminates made from UHMWPE slit films, tapes, or sheets that can be fabricated into laminated panels suitable for the construction of protective or containment structures.

As the invention has been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the appended claims.

What is claimed is:

1. A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit film, sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

2. The ballistic panel of claim 1 wherein said ultra high molecular weight polyethylene slit film fibers, tapes, sheets or films have a thickness below about 3 mils.

3. The ballistic panel of claim 2 having a thickness above about ¼ inch.

4. The ballistic panel of claim 3 having a thickness above about ½ inch.

5. The ballistic panel of claim 3 comprising a plurality of individual layers of highly oriented ultra high molecular weight polyethylene slit film sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other without an adhesive mechanism.

6. The ballistic panel of claim 3 comprising individual layers of highly oriented ultra high molecular weight polyethylene slit film sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other with an adhesive mechanism.

7. A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit films having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

US 7,470,459 B1

9

10

**8**. The ballistic panel of claim **7** wherein said ultra high molecular weight polyethylene slit film fibers, tapes, sheets or films have a thickness below about 3 mils.

**9**. The ballistic panel of claim **8** having a thickness above about ¼ inch.

**10**. The ballistic panel of claim **9** having a thickness above about ½ inch.

**11**. The ballistic panel of claim **9** comprising a plurality of individual layers of highly oriented ultra high molecular weight polyethylene slit film having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other without an adhesive mechanism.

**12**. The ballistic panel of claim **9** comprising individual layers of highly oriented ultra high molecular weight polyethylene slit film having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other with an adhesive mechanism.

* * * * *

# THE JACKSON PATENT GROUP

**AUZVILLE JACKSON, JR.**, B.S.
METALLUR. ENG., J.D., REG. NO. 17,306
**ARTHUR L. GIRARD**, B.S. CHEMISTRY,
J.D., REG. NO. 24,600

1500 FOREST AVENUE
SUITE 212
RICHMOND, VIRGINIA 23229
USA

TELEPHONE (804) 673-9971
FAX (804) 673-9972

AN AFFILIATION OF REGISTERED PATENT PRACTITIONERS

**RONALD G. SAKACH**, B.S. CHEMICAL
ENG., M.B.A., REG. NO. 39,352
**ANTHONY TACCONI**, B.S. BIOLOGY,
J.D., REG. NO. 48,660

JACKSON CREEK HARBOUR OFFICE
TELEPHONE (804) 514-9280
FAX (804) 776-0144

Direct Dial:  (804) 740-6828
Direct Fax:  (804) 740-1881
E-mail Address: auzville.jackson@verizon.net

## FAX TRANSMITTAL COVER SHEET

TO:            Legal Department
               DSM Dyneema
               5900 Martin Luther King, Jr. Hwy
               Greenville, NC  29835

FAX NUMBER:    (252) 707-4638

FROM:          Auzville Jackson, Jr.

DATE:          November 5, 2010

SUBJECT:       Contributory Infringement of U.S. Patents 7,470,459 and 7,348,053

NUMBER OF PAGES, *INCLUDING* COVER SHEET:  20

THE INFORMATION TRANSMITTED HEREWITH MAY BE CONFIDENTIAL AND PROTECTED BY LAW AS ATTORNEY-CLIENT
COMMUNICATION, ATTORNEY WORK PRODUCT, PROPRIETARY INFORMATION, OR OTHERWISE. IT IS INTENDED FOR THE
EXCLUSIVE USE OF THE NAMED RECIPIENT. IF YOU ARE NOT THE NAMED RECIPIENT, YOU ARE HEREBY NOTIFIED THAT
ANY USE, COPYING, DISCLOSURE, OR DISTRIBUTION OF THIS INFORMATION MAY BE SUBJECT TO LEGAL RESTRICTION OR
SANCTION, AND YOU ARE REQUESTED TO NOTIFY US BY TELEPHONE TO ARRANGE FOR RETURN OR DESTRUCTION OF
THIS COMMUNICATION.

**PATENT, TRADEMARK, AND OTHER INTELLECTUAL PROPERTY MATTERS**

# THE JACKSON PATENT GROUP

AUZVILLE JACKSON, JR., B.S.
METALLUR. ENG., J.D., REG. NO. 17,306
ARTHUR L. GIRARD, B.S. CHEMISTRY,
J.D., REG. NO. 24,600

1500 FOREST AVENUE
SUITE 212
RICHMOND, VIRGINIA 23229
USA

TELEPHONE (804) 673-9971
FAX (804) 673-9972

AN AFFILIATION OF REGISTERED PATENT PRACTITIONERS

RONALD G. SAKACH, B.S. CHEMICAL
ENG., M.B.A., REG. NO. 39,352
ANTHONY TACCONI, B.S. BIOLOGY,
J.D., REG. NO. 48,660

JACKSON CREEK HARBOUR OFFICE
TELEPHONE (804) 514-9080
FAX (804) 776-0144

Direct Dial: (804) 740-6828
Direct Fax: (804) 740-1881
E-mail Address: auzville.jackson@verizon.net
November 5, 2010

Legal Department
DSM Dyneema
5900 Martin Luther King Jr. Hwy
Greenville, NC 29835

*Sent by Fax to 252-707-4638*

cc:     Sasja Spiertz
sasja.spiertz@dsm.com

## Contributory Infringement of
## U.S. Patent 7,470,459 and
## U.S. Patent 7,348,053

Mesdames/Gentlemen:

Please find enclosed copies of U.S. Patent 7,470,459 ('459) and 7,348,053 ('053).

It is understood that you are supplying BT 10 material to Converters in the United States from your facility in Switzerland. Our review indicates that you are probably infringing at least Claim 1 of '459 as a contributory infringer.

We will be pleased to discuss the matter and will look forward to your early reply.

Cordially,

Auzville Jackson, Jr.
Counsellor-at-Law

PATENT, TRADEMARK, AND OTHER INTELLECTUAL PROPERTY MATTERS




US007470459B1

(12) **United States Patent**     (10) **Patent No.:** **US 7,470,459 B1**
Weedon et al.                      (45) **Date of Patent:**     **Dec. 30, 2008**

(54) **ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES**

(75) Inventors: **Gene C. Weedon**, Richmond, VA (US); **Charles Paul Weber, Jr.**, Monroe, NC (US); **Kenneth C. Harding**, Midlothian, VA (US)

(73) Assignee: **BAE Systems Tensylon H.P.M., Inc**, Monroe, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **12/012,271**

(22) Filed: **Feb. 1, 2008**

**Related U.S. Application Data**

(60) Continuation of application No. 11/217,277, filed on Sep. 1, 2005, now Pat. No. 7,348,053, which is a continuation-in-part of application No. 10/926,681, filed on Aug. 25, 2004, now Pat. No. 6,951,685, which is a division of application No. 09/999,083, filed on Nov. 27, 2001, now abandoned.

(51) **Int. Cl.**
     **B32B 3/06**          (2006.01)

(52) **U.S. Cl.** ...................... 428/103; 428/297.7; 428/911
(58) **Field of Classification Search** ................. 428/103, 428/297.7, 911; 2/2.5, 5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,709,850 A | * | 12/1987 | Wagner ....................... 229/303 |
| 5,093,197 A | * | 3/1992 | Howard et al. ............... 428/372 |
| 5,578,373 A | * | 11/1996 | Kobayashi et al. ........... 428/364 |
| 6,951,685 B1 | * | 10/2005 | Weedon et al. .............. 428/364 |
| 7,348,053 B1 | * | 3/2008 | Weedon et al. ............, 428/297.7 |
| 2002/0049269 A1 | * | 4/2002 | HO et al. ..................... 524/186 |
| 2002/0132923 A1 | * | 9/2002 | Langohr et al. ............. 525/191 |
| 2005/0197020 A1 | * | 9/2005 | Park et al. ...................... 442/36 |
| 2005/0203232 A1 | * | 9/2005 | Rolland et al. .............. 524/425 |

* cited by examiner

*Primary Examiner*---N. Edwards

(57)          **ABSTRACT**

Ballistic panels formed by the lamination of highly oriented ultra high molecular weight poly(ethylene) slit films and sheets useful in the fabrication of ballistic containers are described.

**12 Claims, 4 Drawing Sheets**



11/05/2010 13:36 FAX 8047401881

U.S. Patent          Dec. 30, 2008          Sheet 1 of 4          US 7,470,459 B1

AUZVILLE-JACKSON

Ⓩ004/021



FIG. 1

11/05/2010 13:37 FAX 8047401881          AUZVILLE-JACKSON                    ☑005/021

**U.S. Patent**       Dec. 30, 2008       Sheet 2 of 4       US 7,470,459 B1



*FIG. 2*

11/05/2010 13:37 FAX   8047401881

U.S. Patent

Dec. 30, 2008

Sheet 3 of 4

AUZVILLE-JACKSON

US 7,470,459 B1



*FIG. 3*

**U.S. Patent**    Dec. 30, 2008    Sheet 4 of 4    **US 7,470,459 B1**



*FIG. 4*

*FIG. 5*

US 7,470,459 B1

## ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES

This application is a Continuation of U.S. patent application Ser. No. 11/217,277 filed Sep. 1, 2005 and now U.S. Pat. No. 7,348,053 which is a Continuation-in-part of U.S. patent application Ser. No. 10/926,681, filed Aug. 25, 2004 and now U.S. Pat. No. 6,951,685 which was a division of Ser. No. 09/999,083 filed Nov. 27, 2001, abandoned.

### FIELD OF THE INVENTION

The present invention relates to thin tapes of ultra high molecular weight polyethylene fibers and tapes and to methods for their production and more particularly to fabrics woven from such materials that are suitable for use in ballistic structures.

### BACKGROUND OF THE INVENTION

The processing of ultra high molecular weight polyethylene (UHMWPE), i.e. polyethylene having a molecular weight in excess of 5 million, is known in the polymer arts to be extremely difficult. Products made from such materials are, however, very strong, tough and durable.

In the following series of U.S. patents filed by Kobayashi et al and assigned to Nippon Oil Co., Ltd. a number of inventions related to the fabrication of fibers and films of polyolefins generally and UHMWPE specifically, are described: U.S. Pat. Nos. 4,996,011, 5,002,714, 5,091,133, 5,106,555, 5,200, 129, and 5,578,373. The processes described in these patents are depicted schematically in FIG. 1 and generally describe the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compression molding the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. Some of these patents also discuss the fibrillation of the resultant films and slitting of the films to form "fibers". As compression molded, the sheet is relatively friable thus requiring the subsequent stretching or drawing operations to provide an oriented film that exhibits very good strength and durability properties. In fact, the strength of such materials produced by these processes is 3 times that of steel on a weight basis and they exhibit very low creep. The UHMWPE films produced by the processes described in these patents have a final thickness of between 0.003" and 0.012".

While the thus produced materials quite obviously exhibit highly desirable properties, including useful ballistic properties, one of their major shortcomings is their relative stiffness that makes them difficult to "weave" and otherwise process into useful products. When woven, the resulting fabrics also tend to be very stiff and uncomfortable. This stiffness is largely a result of the fact that the fibers or tapes produced as just described are relatively "thick", i.e. on the order of more than about 3 mils. In order to obtain a material that can be easily woven to provide comfortable clothing and the like, and find use in such other applications as dental floss (another "high strength/thin material application) and high strength "thread" or fiber, it is necessary that the "thickness" of the UHMWPE film be reduced to below 3 mils and preferably below about 2 mils. Subsequent slitting and other treatments, for example fibrillation, can further contribute to the production of such products. Because of the high strength of these materials, it has been thought until now that the best approach

to achieve such "thickness reduction" was to slit the film of the prior art into narrow strips (on the order of about 10 mils) and to stretch such narrow strips. This has proven largely unsuccessful since the material in such narrow widths will either refuse to stretch or break when elongated under conventional drawing and/or calendering processes. In fact, until the application of the methods described herein, to the best of our knowledge, no attempt to achieve draw ratios greater than 100, as would be necessary to meet the above-described requirements, has been successful. It is well known in the art that at a given thickness, the ballistic performance of an assembly is enhanced by having more layers due to the ability of multiple thinner layers acting in concert function more efficiently in ballistic applications.

It therefore would be most desirable to define a process whereby these high strength materials could be fabricated into films, sheets or tapes and "fibers" that are less than 3 mils and preferably below about 2 mils in thickness. The provision of such a process would open up entirely new applications for these materials in such diverse fields as ballistic structures.

### OBJECTS OF THE INVENTION

It is therefore an object of the present invention to provide a method for the production of UHMWPE films having unique properties that make them amenable for use in structures that have not been possible to fabricate with similar prior art materials.

It is another object of the present invention to provide highly oriented UHMWPE slit film or sheets that can be fabricated into ballistic structures through lamination.

### SUMMARY OF THE INVENTION

According to the present invention, there is provided a method for the production of a novel class of highly oriented slit films, fibers and sheets of highly oriented UHMWPE that are preferably below about 3 mils and more preferably below about 2 mils in thickness. The process involves: compression molding/compacting a very specific class of UHMWPE starting material under very carefully controlled temperature conditions to yield compacted tapes, fibers or sheets; and calendering and/or drawing the tapes, sheets, films or fibers thus produced under controlled tension at a temperature above the melting point of the UHMWPE material. Slitting of the resulting tapes, sheets, films or fibers with a heated knife results in the production of slit film fibers, films, tapes or sheets that find use in ballistic structures when laminated as described herein.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic representation of the production process of the prior art and the thin fiber/film production processes of the present invention.

FIG. 2 is a schematic diagram of the drawing unit used to implement the process of the present invention.

FIG. 3 is a schematic diagram of the calendering unit used to implement the process of the present invention.

FIG. 4 is a cross-sectional view of a film, sheet or tape having an adhesive layer laminated thereto which laminated film, sheet or tape finds use in accordance with the present invention.

FIG. 5 is a cross-sectional view of a laminated composite in accordance with the present invention.

US 7,470,459 B1

**3**

## DETAILED DESCRIPTION

The method of the present invention provides a process for the production of a unique class of UHMWPE tapes/sheets/slit films and fibers that are preferably below 3 about mils and more preferably below about 2 mils in thickness. The process involves: compacting a very specific class of UHMWPE starting materials under very carefully controlled temperature conditions to yield compacted sheets; and drawing and calendaring the compacted under careful tension control at a temperature near the onset of melt of the UHMWPE material to produce thin fibers, films, tapes and sheets of UHMPE. Slitting of the resulting tapes, films, sheets or fibers with a heated knife results in such products that find use in such diverse applications as dental floss, personal armor, ballistic structures and sails for sail boats fabricated from woven or laminated materials of these fibers, films, tapes or sheets.

The term "tape" as used herein refers to products having widths on the order of or greater than about ½ inch and preferably greater than 1 inch, of a generally rectangular cross-section and having smooth edges and is specifically used to distinguish from the "fiber" product materials of the prior art of similar UHMWPE composition that were on the order of ⅛ of an inch wide or narrower and contained ragged or serrated edges about their periphery necessitating twisting in any weaving operation as is well known in the weaving arts. The term "slit film fiber" refers specifically to a "fiber" or narrow tape made in accordance with the present invention that exhibits a generally rectangular cross-section and smooth, i.e. non-serrated or ragged edges. The term "sheet" as used herein is meant to refer to thin sections of the materials of the present invention in widths up to and exceeding 160 inches in width as could be produced in large commercial equipment specifically designed for production in such widths and having the same generally rectangular cross-section and smooth edges. Hence, the fundamental difference between a "tape", a "slit film fiber" and a "sheet" as used to describe the products of the processes described herein relates to the width thereof and is generally independent of the thickness thereof.

Referring now to FIG. 1, the processes described in the prior art and depicted schematically in FIG. 1 comprised the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compacting the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. To the extent of their relevance to the modified processes described herein, the aforementioned prior art descriptions are incorporated herein by reference in their entirety.

The fundamental differences between the processes of the prior art and those described herein that result in the production of highly enhanced UHMWPE products begin with the selection of the UHMWPE input material. According to the present invention, the UHMWPE must exhibit high crystallinity (above about 80% as determined by differential scanning calorimetry), a heat of fusion equal to or greater than 220 joules/gram and low levels of entanglement. It is critically important to the successful practice of the present invention that the input starting material UHMWPE possess the degree of crystallinity and heat of fusion and meet the low entanglement requirements stated above. Such commercially available materials as Ticona X-168 from Ticona Engineering Polymers, 2600 Updike Road, Auburn Hills MI 48236 and

**4**

type 1900 CM from Basell Corp. 2801 Centerville Road, Wilmington, Del. 19808 are useful in the successful practice of the present invention.

The second important difference between the process of the present invention and that described in the referenced prior art relates to the compaction step that is performed on the input UHMWPE input material to obtain the product form that forms the starting material for the drawing/calendaring steps. According to the preferred fabrication process of the present invention, the compaction step described in the prior art cited hereinabove is performed at a very carefully controlled temperature range. Since the UHMWPE materials do not exhibit a discrete "melt temperature" in the conventional sense but rather "melt" over a relatively wide temperature range of generally between about 135 (onset of melt) to about 138.5° C. (actual melting in the conventional sense). Hence while the preferred temperature range for compaction is below the melting point of the polymer, compaction can be performed over a temperature range between the onset of melt and melting, a range which will generally be about 4° C. Such a range can be generally described as between about 5 degrees below to about 4 degrees above the onset of melt of the polymer, ~130 to about 138 degrees C., and preferably at a temperature of from 2 degrees below the onset of melt of the polymer to about 1 degree above this temperature. Hence, compacting temperatures of between about 130° C. and about 143° C. are generally, but not necessarily, adequate for acceptable compaction depending upon the nature of the UHMWPE powder being so compacted. It should be noted that at higher compaction pressures the operative temperatures for this step can be somewhat lower than those described above. In the prior art, temperature control was not considered particularly critical and the only direction was that it be less than the melting point of the polymer. Compression ratios of from about 3:1 to about 9:1 and preferably between about 6:1 and about 8:1 have been found to yield optimum properties. Compaction in these ranges results in the production of a compacted sheet that is of very uniform density and thickness and suitable for further processing in accordance with the method of the present invention that results in the formation of the optimized products described herein. Compacted sheet exhibiting a density of between about 0.85 g/cm³ and 0.96 g/cm³ is preferred as the compacted sheet starting material for the subsequent drawing and calendaring processes.

Referring now to FIG. 2, the drawing apparatus utilized to achieve the thickness reductions of the compacted sheet produced as just described that result in production of the preferred UHMWPE products of the present invention 10 comprises:

a payoff 12, a godet stand 14 including heated godet rolls 16 (to anneal the product) and nip rolls 18 for establishing and maintaining tension in the line, a first draw zone 20, a first in-line tension sensor 22, a second godet stand 24, a second draw stand 26, a second in-line tension sensor 28, a third godet stand 30 and according to the preferred embodiment, a fibrillation unit 32, a nip roll stand 34 for maintaining tension and godet station 36 comprised of unheated take-up rolls 38. As seen from FIG. 1, the input or starting material of this process is generally the thick, compressed and rolled but unoriented product of the compaction step of the modified and carefully controlled prior art production process, modified as to the degree of UHMWPE and compacting conditions, as described above, that exhibits a thickness on the order of 10 mils or more. The input or starting material in the drawing/calendaring process steps described below is, of course, somewhat more sophisticated and narrowly defined in view of the native polymer input property requirements, i.e. degree

US 7,470,459 B1

5

of crystallinity, heat of fusion and low entanglement as is the compaction process that involves significantly more carefully controlled temperature conditions.

Each of the elements of the apparatus just described and utilized in the successful practice of the present invention are well known in the film and fiber drawing arts as is their combination in a line of the type just described. Consequently, no detailed description of such a line is required or will be made herein and the reader is referred to the numerous design manuals and descriptions of such apparatus commonly available in the art.

Similarly, the calendering apparatus depicted in FIG. 2 and described below requires no description beyond that presented immediately below as each of its elements and the combination thereof are well known in the fiber and film calendering arts and easily constructed in accordance with that general knowledge.

Referring now to FIG. 2, the calendering apparatus 40 useful in the production of the UHMWPE materials described herein comprises:

an unwind or payoff station 42, a tension control device 44, a preheat section 46, a pair of heated calender rolls 48, a second tension control section 50 and a rewind or take-up station 52. Preheat section 46 heats the input material to the temperatures described below prior to entry of the input material into calender roll pair 48. Calender rolls 48 are heated to impart the operating temperatures indicated below to the preheated input material and rotate the direction of arrows 54 shown in FIG. 3. The thickness of the UHMWPE product produced by calendering in the equipment depicted in FIG. 3 will, of course be dictated by the gap at nip 56 between calender rolls 48. Such gap can be controlled by either setting a fixed gap to produce product of the desired thickness or by applying a controlled pressure in nip 56.

While the calendering equipment just described is similarly generally old and well known in the prior art, the operation of same in the production of the UHMWPE films and fibers of the present invention is new and forms one core element of the process aspect of the present invention.

Thus according to the present invention, input material comprising an UHMWPE "tape", "sheet" or "fiber" is produced in the modified prior art production processes described hereinabove, i.e. modified as to input material and temperature control is introduced into a drawing and calendering apparatus of the type just described and depicted in FIGS. 2 and 3. In the case of the drawing operation, the input material can be a "tape" having a width greater than about ⅛" and preferably in the range of 2.5 to about 3.0 inches, but it could be much wider given the availability of commercial equipment adequate in scale and power to perform the required operations. In the calendering operation, the input material is generally a "fiber" having a width below about ⅛". In either process, the input material described above is first preheated to a temperature near the onset of melt as described above, and drawing and calendering is accomplished by the application of 1) constant and controlled tension in the case of the drawing operation and 2) pressure with controlled tension in the case of the calendering operation at temperatures of between slightly below or above the onset of melt as previously described. Drawing is preferably performed at a temperature of between about 140° C. and about 158° C. and most preferably between about 148° C. and about 150° C. for commercially available UHMWPE compacted powders although variations in the UHMWPE compositions utilized as starting materials may allow for alteration of these temperature ranges. At temperature levels below the previously defined ranges, no significant thickness reduction will occur,

6

while at temperatures above these ranges the material will tend to separate in the drawing and calendering operations. Calendering can in fact be performed over a very wide temperature range with the calendering rolls being at temperatures from ambient to well above the actual melt temperature of the polymer depending upon such variables as equipment capabilities such as speed of calendering, pressure applied, etc. The only true limitation being that the compacted and drawn sheet not melt during calendering.

Maintaining a controlled tension of between about 0.5 and about 5 g/denier, and preferably between about 0.8 and 3 g/denier is also important to the production of product having the required "thinness" specified herein. Denier as used herein is defined as the weight in grams of 9000 meters of the product film, sheet or fiber, during drawing and calendering, is also highly important to the successful production of a suitable product having the required "thinness" specified herein. At tension levels below 0.5 g/denier no significant drawing or reduction will be obtained while at tension levels above about 5 g/denier the material will tend to separate. In the case of drawing, tension is a function of the feed polymer and can vary broadly depending thereon and the ranges just specified refer to shoes found useful with particular commercial starting materials. The UHMWPE films, sheets, fibers or tapes produced by the process just described exhibit heats of fusion at or above about 243 joules/gram.

Total reductions achieved during drawing and calendering will generally be between about 50:1 and about 170:1 or more depending again upon the input raw material and the end use to which the product is to be applied. Such total drawing and calendering is computed as the multiple of each of the individual reductions achieved by each of the combined process steps.

After thickness reduction by calendering and/or drawing in the apparatus shown in FIGS. 2 and 3 and according to the processing parameters just described, various additional operations can be performed to make the product suitable for the various product applications described below.

For example, as shown in FIG. 2, the drawing line or apparatus 10 may include a fibrillation roll or other apparatus for purposes of introducing short slits across the width of the product film, sheet or fiber. Fibrillation and the equipment used to produce it are both well known in the art and, in fact, were used in the prior art production processes. Fibrillation while often incorporated into the production lines for the materials described herein is not essential to the successful practice of the present invention. The tape, sheet, film or fiber output of the drawing and calendering processes can be slit to an appropriate width for the production of fibers and then subsequently fibrillated. As described below, special slitting treatments provide even more unique products.

As will be apparent to the skilled artisan, combinations of the calendering and drawing processes within the parameters described herein can easily be envisioned, and such combinations are intended to be within the scope of the appended claims.

As discussed hereinafter, the provision of smooth edges on the tape, sheet, film and fiber described herein provides significant advantages over similar prior art products. The attainment of such smooth edges that result in many of the enhanced products described herein and the generally rectangular cross-section of such products can only be achieved using the slitting techniques described below. The use of conventional slitting knives as are used in the art in the production of, for example blown films, and as were used in the slitting portion of the prior art processes described above, while suitable for the production of fibers, sheets, tapes and

US 7,470,459 B1

7

films in accordance with the present invention have a major shortcoming in that they leave a serrated surface at the point of slitting. This serration can result in the generation of stress risers that weaken the laminates described hereinafter when they are applied in ballistic applications. Accordingly, it has been discovered that the use of heated slitting knives, heated to a temperature of above the melting point of the UHMWPE, i.e. above about 141°-142° C. must be used to provide an even or smooth surface suitable for use in ballistic structures and laminates. The application of the process just described in combination with slitting using heated knives results in the production of highly oriented ultra high molecular weight polyethylene slit film fibers, tapes, sheets and films that are of a generally rectangular cross-section and have smooth cut edges.

The production of laminated structures produced by laminating a plurality of layers of films or sheets of these materials either directly to each other or through the mechanism of an adhesive of one type or another, also provide products exhibiting desirable ballistic properties.

Referring now to FIGS. 4 and 5 attached hereto, FIG. 4 depicts a cross-section of a composite sheet material suitable for lamination in accordance with the present invention. As shown in FIG. 4 such a composite sheet 58 comprises a sheet 60 of UHMWPE material fabricated in accordance with the present invention having a layer of a sheet adhesive 62 laminated thereto. Such a sheet adhesive may comprise, for example, a layer of high density polyethylene having a thickness on the order of, for example 30μ, and exhibiting a melting point lower than that of the UHMWPE so that no weakening of the UHMWPE occurs during subsequent lamination operations as described below. Exposure of the UHMWPE sheet may result in diminution of the ballistics properties thereof. It is to be noted that, while a sheet adhesive forms one preferred embodiment of a method of joining sheets of UHMWPE in the laminated fabrics described below, other adhesive materials capable of joining alternating sheets of UHMWPE may be substituted therefore. These include for example vinyl ester adhesives, flexible epoxies etc. that could be similarly used. In point of fact, fabrics of alternating layers of the UHMWPE materials described herein can be laminated without adhesive by the simple step of applying even relatively low pressures of from about 5-10 psi up to over 150 psi while heating layers of the UHMWPE sheet to a point near the softening point of the material or about 152 degrees C.

FIG. 5 depicts a cross-sectional view of a laminated structure or panel 68 fabricated in accordance with the present invention utilizing the laminated composite shown in FIG. 4. As will be apparent to the skilled artisan, it is highly desirable that the alternating sheets of UHMWPE 60 be cross oriented, i.e. be laminated in alternating directions due to the significant orientation of these sheets induced by the drawing and/or calendaring operations described above and the consequent relative directional character of their various properties.

The ballistic properties/performance of UHMWPE materials, in particular the gel spin versions of such materials produced by Honeywell International, Richmond, Va. and sold under the trademark Spectra®, have been studied and reported widely. The ballistic performance of the materials described herein that can be produced at a significantly lower cost than the gel spun Spectra® fibers will be about equivalent to these prior art UHMWPE materials, but available at significantly lower cost due to the significantly reduced cost of their production. The strain rate sensitivity of these materials, i.e. their property of becoming stronger the faster strain is

8

applied thereto, makes them particularly useful in ballistic applications where large strains are applied very quickly by an incoming threat.

Ballistic panels as claimed hereinafter are fabricated as just described by laminating a plurality of layers of the sheet/films described above, preferably in alternating orientations, and, of course need not to be self-supporting in order to be practical for use as ballistic containers, buildings etc., i.e. closed structures, capable of withstanding ballistic forces whether addressed from within the structure (containment) or outside of the structure (protection). Self-supporting panels suitable for the construction/assembly of ballistic structures are generally, but need not be, above about ¼ inch and preferably above about ½ inch in thickness to provide basic levels of ballistic resistance and at least minimal structural strength when appropriately assembled into a container or building in a conventional fashion. There is no practical upper limit to the thickness of such panels except as may be imposed by the particular application or the ability to fabricate a certain thickness.

While it is theoretically possible to fabricate the ballistic panels described herein from the tapes or slit film fibers described hereinabove, it is probably cost prohibitive to do so, but such ballistic panels fabricated from these starting materials are intended to be within the scope of the appended claims.

There have thus been described a novel class of laminates made from UHMWPE slit films, tapes, or sheets that can be fabricated into laminated panels suitable for the construction of protective or containment structures.

As the invention has been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the appended claims.

What is claimed is:

1. A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit film, sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

2. The ballistic panel of claim 1 wherein said ultra high molecular weight polyethylene slit film fibers, tapes, sheets or films have a thickness below about 3 mils.

3. The ballistic panel of claim 2 having a thickness above about ¼ inch.

4. The ballistic panel of claim 3 having a thickness above about ½ inch.

5. The ballistic panel of claim 3 comprising a plurality of individual layers of highly oriented ultra high molecular weight polyethylene slit film sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other without an adhesive mechanism.

6. The ballistic panel of claim 3 comprising individual layers of highly oriented ultra high molecular weight polyethylene slit film sheets or tapes having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other with an adhesive mechanism.

7. A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit films having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

US 7,470,459 B1

9                                    10

**8.** The ballistic panel of claim 7 wherein said ultra high molecular weight polyethylene slit film fibers, tapes, sheets or films have a thickness below about 3 mils.

**9.** The ballistic panel of claim 8 having a thickness above about ¼ inch.

**10.** The ballistic panel of claim 9 having a thickness above about ½ inch.

**11.** The ballistic panel of claim 9 comprising a plurality of individual layers of highly oriented ultra high molecular weight polyethylene slit film having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other without an adhesive mechanism.

**12.** The ballistic panel of claim 9 comprising individual layers of highly oriented ultra high molecular weight polyethylene slit film having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram laminated directly to each other with an adhesive mechanism.

* * * * *

US007348053B1

(12) **United States Patent**
Weedon et al.

(10) Patent No.: **US 7,348,053 B1**
(45) Date of Patent: **Mar. 25, 2008**

(54) **ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES**

(75) Inventors: **Geno C. Weedon**, Richmond, VA (US); **Charles Paul Weber, Jr.**, Monroe, NC (US); **Kenneth C. Harding**, Midlothian, VA (US)

(73) Assignee: **Bae Systems Tensylon H.P. Material, Inc**, Monroe, NC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 387 days.

(21) Appl. No.: **11/217,277**

(22) Filed: **Sep. 1, 2005**

**Related U.S. Application Data**

(60) Continuation-in-part of application No. 10/926,681, filed on Aug. 25, 2004, now Pat. No. 6,951,685, which is a division of application No. 09/999,083, filed on Nov. 27, 2001, now abandoned.

(51) **Int. Cl.**
*B32B 27/04* (2006.01)

(52) **U.S. Cl.** .................. 428/297.7; 2/2.5; 2/5; 428/103; 428/911

(58) **Field of Classification Search** ............ 428/297.7, 428/103, 101, 911; 2/2.5, 5
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,424,240 A | * | 1/1984 | Kielbania, Jr. ........... 427/393.5 |
| 5,124,195 A | * | 6/1992 | Harpell et al. ............... 428/152 |
| 2005/0197020 A1 | * | 9/2005 | Park et al. ................. 442/36 |
| 2005/0203232 A1 | * | 9/2005 | Rolland et al. ............. 524/425 |
| 2006/0286883 A1 | * | 12/2006 | Brown et al. ............... 442/135 |

* cited by examiner

*Primary Examiner*—N. Edwards

(57) **ABSTRACT**

Ballistic panels formed by the lamination of highly oriented ultra high molecular weight poly(ethylene) slit films and sheets useful in the fabrication of ballistic containers are described.

**6 Claims, 4 Drawing Sheets**



U.S. Patent        Mar. 25, 2008        Sheet 1 of 4        US 7,348,053 B1



FIG. 1

11/05/2010 13:41 FAX 8047401881          AUZVILLE-JACKSON                    Ø015/021
Case3:10-cv-05466-EDL   Document1   Filed12/02/10   Page46 of 52



*FIG. 2*

11/05/2010 13:41 FAX   8047401881                    AUZVILLE-JACKSON                    ☒016/021



*FIG. 3*



US 7,348,053 B1

1

## ULTRA HIGH MOLECULAR WEIGHT POLYETHYLENE BALLISTIC STRUCTURES

This application is a Continuation-in-part of U.S. patent application Ser. No. 10/926,681 (now U.S. Pat. No. 6,951, 685) filed Aug. 25, 2004 which was a division of Ser. No. 09/999,083 filed Nov. 27, 2001, abandoned.

### FIELD OF THE INVENTION

The present invention relates to thin tapes of ultra high molecular weight polyethylene fibers and tapes and to methods for their production and more particularly to fabrics woven from such materials that are suitable for use in ballistic structures.

### BACKGROUND OF THE INVENTION

The processing of ultra high molecular weight polyethylene (UHMWPE), i.e. polyethylene having a molecular weight in excess of 5 million, is known in the polymer arts to be extremely difficult. Products made from such materials are, however, very strong, tough and durable.

In the following series of U.S. Patents filed by Kobayashi et al and assigned to Nippon Oil Co., Ltd. a number of inventions related to the fabrication of fibers and films of polyolefins generally and UHMWPE specifically, are described: U.S. Pat. Nos. 4,996,011, 5,002,714, 5,091,133, 5,106,555, 5,200,129, and 5,578,373. The processes described in these patents are depicted schematically in FIG. 1 and generally describe the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compression molding the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. Some of these patents also discuss the fibrillation of the resultant films and slitting of the films to form "fibers". As compression molded, the sheet is relatively friable thus requiring the subsequent stretching or drawing operations to provide an oriented film that exhibits very good strength and durability properties. In fact, the strength of such materials produced by these processes is 3 times that of steel on a weight basis and they exhibit very low creep. The UHMWPE films produced by the processes described in these patents have a final thickness of between 0.003" and 0.012".

While the thus produced materials quite obviously exhibit highly desirable properties, including useful ballistic properties, one of their major shortcomings is their relative stiffness that makes them difficult to "weave" and otherwise process into useful products. When woven, the resulting fabrics also tend to be very stiff and uncomfortable. This stiffness is largely a result of the fact that the fibers or tapes produced are just described are relatively "thick", i.e. on the order of more than about 3 mils. In order to obtain a material that can be easily woven to provide comfortable clothing and the like, and find use in such other applications as dental floss (another "high strength/thin material application) and high strength "thread" or fiber, it is necessary that the "thickness" of the UHMWPE film be reduced to below 3 mils and preferably below about 2 mils. Subsequent slitting and other treatments, for example fibrillation, can further contribute to the production of such products. Because of the high strength of these materials, it has been thought until now that the best approach to achieve such "thickness

2

reduction" was to slit the film of the prior art into narrow strips (on the order of about 10 mils) and to stretch such narrow strips. This has proven largely unsuccessful since the material in such narrow widths will either refuse to stretch or break when elongated under conventional drawing and/or calendering processes. In fact, until the application of the methods described herein, to the best of our knowledge, no attempt to achieve draw ratios greater than 100, as would be necessary to meet the above-described requirements, has been successful. It is well known in the art that at a given thickness, the ballistic performance of an assembly is enhanced by having more layers due to the ability of multiple thinner layers acting in concert function more efficiently in ballistic applications.

It therefore would be most desirable to define a process whereby these high strength materials could be fabricated into films, sheets or tapes and "fibers" that are less than 3 mils and preferably below about 2 mils in thickness. The provision of such a process would open up entirely new applications for these materials in such diverse fields as ballistic structures.

### OBJECTS OF THE INVENTION

It is therefore an object of the present invention to provide a method for the production of UHMWPE films having unique properties that make them amenable for use in structures that have not been possible to fabricate with similar prior art materials.

It is another object of the present invention to provide highly oriented UHMWPE slit film or sheets that can be fabricated into ballistic structures through lamination.

### SUMMARY OF THE INVENTION

According to the present invention, there is provided a method for the production of a novel class of highly oriented slit films, fibers and sheets of highly oriented UHMWPE that are preferably below about 3 mils and more preferably below about 2 mils in thickness. The process involves: compression molding/compacting a very specific class of UHMWPE starting material under very carefully controlled temperature conditions to yield compacted tapes, fibers or sheets; and calendering and/or drawing the tapes, sheets, films or fibers thus produced under controlled tension at a temperature above the melting point of the UHMWPE material. Slitting of the resulting tapes, sheets, films or fibers with a heated knife results in the production of slit film fibers, films, tapes or sheets that find use in ballistic structures when laminated as described herein.

### DESCRIPTION OF THE DRAWINGS

FIG. 1 is a schematic representation of the production process of the prior art and the thin fiber/film production processes of the present invention.

FIG. 2 is a schematic diagram of the drawing unit used to implement the process of the present invention.

FIG. 3 is a schematic diagram of the calendering unit used to implement the process of the present invention.

FIG. 4 is a cross-sectional view of a film, sheet or tape having an adhesive layer laminated thereto which laminated film, sheet or tape finds use in accordance with the present invention.

FIG. 5 is a cross-sectional view of a laminated composite in accordance with the present invention.

US 7,348,053 B1

<table>
<tr><td>3</td><td>4</td></tr>
</table>

## DETAILED DESCRIPTION

The method of the present invention provides a process for the production of a unique class of UHMWPE tapes/sheets/slit films and fibers that are preferably below 3 about mils and more preferably below about 2 mils in thickness. The process involves: compacting a very specific class of UHMWPE starting materials under very carefully controlled temperature conditions to yield compacted sheets; and drawing and calendaring the compacted under careful tension control at a temperature near the onset of melt of the UHMWPE material to produce thin fibers, films, tapes and sheets of UHMPE. Slitting of the resulting tapes, films, sheets or fibers with a heated knife results in such products that find use in such diverse applications as dental floss, personal armor, ballistic structures and sails for sail boats fabricated from woven or laminated materials of these fibers, films, tapes or sheets.

The term "tape" as used herein refers to products having widths on the order of or greater than about ½ inch and preferably greater than 1 inch, of a generally rectangular cross-section and having smooth edges and is specifically used to distinguish from the "fiber" product materials of the prior art of similar UHMWPE composition that were on the order of ⅛ of an inch wide or narrower and contained ragged or serrated edges about their periphery necessitating twisting in any weaving operation as is well known in the weaving arts. The term "slit film fiber" refers specifically to a "fiber" or narrow tape made in accordance with the present invention that exhibits a generally rectangular cross-section and smooth, i.e. non-serrated or ragged edges. The term "sheet" as used herein is meant to refer to thin sections of the materials of the present invention in widths up to and exceeding 160 inches in width as could be produced in large commercial equipment specifically designed for production in such widths and having the same generally rectangular cross-section and smooth edges. Hence, the fundamental difference between a "tape", a "slit film fiber" and a "sheet" as used to describe the products of the processes described herein relates to the width thereof and is generally independent of the thickness thereof.

Referring now to FIG. 1, the processes described in the prior art and depicted schematically in FIG. 1 comprised the continuous production of high strength and high modulus polyolefin films by feeding polyolefin powder between a combination of endless belts disposed in an up and down opposing relationship, compacting the polyolefin powder at a temperature below its melting point between the endless belts and then rolling and stretching the resultant compression molded polyolefin into an oriented film. To the extent of their relevance to the modified processes described herein, the aforementioned prior art descriptions are incorporated herein by reference in their entirety.

The fundamental differences between the processes of the prior art and those described herein that result in the production of highly enhanced UHMWPE products begin with the selection of the UHMWPE input material. According to the present invention, the UHMWPE must exhibit high crystallinity (above about 80% as determined by differential scanning calorimetry), a heat of fusion equal to or greater than 220 joules/gram and low levels of entanglement It is critically important to the successful practice of the present invention that the input starting material UHMWPE possess the degree of crystallinity and heat of fusion and meet the low entanglement requirements stated above. Such commercially available materials as Ticona X-168 from Ticona Engineering Polymers, 2600 Updike Road, Auburn Hills

Mich. 48236 and type 1900 CM from Basell Corp. 2801 Centerville Road, Wilmington, Del. 19808 are useful in the successful practice of the present invention.

The second important difference between the process of the present invention and that described in the referenced prior art relates to the compaction step that is performed on the input UHMWPE input material to obtain the product form that forms the starting material for the drawing/calendaring steps. According to the preferred fabrication process of the present invention, the compaction step described in the prior art cited hereinabove is performed at a very carefully controlled temperature range. Since the UHMWPE materials do not exhibit a discrete "melt temperature" in the conventional sense but rather "melt" over a relatively wide temperature range of generally between about 135 (onset of melt) to about 138.5° C. (actual melting in the conventional sense). Hence while the preferred temperature range for compaction is below the melting point of the polymer, compaction can be performed over a temperature range between the onset of melt and melting, a range which will generally be about 4° C. Such a range can be generally described as between about 5 degrees below to about 4 degrees above the onset of melt of the polymer, ~130 to about 137 degrees C., and preferably at a temperature of from 2 degrees below the onset of melt of the polymer to about 1 degree above this temperature. Hence, compacting temperatures of between about 130° C. and about 143° Care generally, but not necessarily, adequate for acceptable compaction depending upon the nature of the UHMWPE powder being so compacted. It should be noted that at higher compaction pressures the operative temperatures for this step can be somewhat lower than those described above. In the prior art, temperature control was not considered particularly critical and the only direction was that it be less than the melting point of the polymer. Compression ratios of from about 3:1 to about 9:1 and preferably between about 6:1 and about 8:1 have been found to yield optimum properties. Compaction in these ranges results in the production of a compacted sheet that is of very uniform density and thickness and suitable for further processing in accordance with the method of the present invention that results in the formation of the optimized products described herein. Compacted sheet exhibiting a density of between about 0.85 g/cm³ and 0.96 g/cm³ is preferred as the compacted sheet starting material for the subsequent drawing and calendaring processes.

Referring now to FIG. 2, the drawing apparatus utilized to achieve the thickness reductions of the compacted sheet produced as just described that result in production of the preferred UHMWPE products of the present invention 10 comprises:

a payoff 12, a godet stand 14 including heated godet rolls 16 (to anneal the product) and nip rolls 18 for establishing and maintaining tension in the line, a first draw zone 20, a first in-line tension sensor 22, a second godet stand 24, a second draw stand 26, a second in-line tension sensor 28, a third godet stand 30 and according to the preferred embodiment, a fibrillation unit 32, a nip roll stand 34 for maintaining tension and godet station 36 comprised of unheated take-up rolls 38. As seen from FIG. 1, the input or starting material of this process is generally the thick, compressed and rolled but unoriented product of the compaction step of the modified and carefully controlled prior art production process, modified as to the input UHMWPE and compacting conditions, as described above, that exhibits a thickness on the order of 10 mils or more. The input or starting material in the drawing/calendaring process steps described below is,

US 7,348,053 B1

| 5 | 6 |

of course, somewhat more sophisticated and narrowly defined in view of the native polymer input property requirements, i.e. degree of crystallinity, heat of fusion and low entanglement as is the compaction process that involves significantly more carefully controlled temperature conditions.

Each of the elements of the apparatus just described and utilized in the successful practice of the present invention are well known in the film and fiber drawing arts as is their combination in a line of the type just described. Consequently, no detailed description of such a line is required or will be made herein and the reader is referred to the numerous design manuals and descriptions of such apparatus commonly available in the art.

Similarly, the calendering apparatus depicted in FIG. 2 and described below requires no description beyond that presented immediately below as each of its elements and the combination thereof are well known in the fiber and film calendering arts and easily constructed in accordance with that general knowledge.

Referring now to FIG. 2, the calendering apparatus 40 useful in the production of the UHMWPE materials described herein comprises:

an unwind or payoff station 42, a tension control device 44, a preheat section 46, a pair of heated calender rolls 48, a second tension control section 50 and a rewind or take-up station 52. Preheat section 46 heats the input material to the temperatures described below prior to entry of the input material into calender roll pair 48. Calender rolls 48 are heated to impart the operating temperatures indicated below to the preheated input material and rotate the direction of arrows 54 shown in FIG. 3. The thickness of the UHMWPE product produced by calendering in the equipment depicted in FIG. 3 will, of course be dictated by the gap at nip 56 between calender rolls 48. Such gap can be controlled by either setting a fixed gap to produce product of the desired thickness or by applying a controlled pressure in nip 56.

While the calendering equipment just described is similarly generally old and well known in the prior art, the operation of same in the production of the UHMWPE films and fibers of the present invention is new and forms one core element of the process aspect of the present invention.

Thus according to the present invention, input material comprising an UHMWPE "tape", "sheet" or "fiber" as produced in the modified prior art production processes described hereinabove, i.e. modified as to input material and temperature control is introduced into a drawing and calendering apparatus of the type just described and depicted in FIGS. 2 and 3. In the case of the drawing operation, the input material can be a "tape" having a width greater than about ⅛" and preferably in the range of 2.5 to about 3.0 inches, but it could be much wider given the availability of commercial equipment adequate in scale and power to perform the required operations. In the calendering operation, the input material is generally a "fiber" having a width below about ⅛". In either process, the input material described above is first preheated to a temperature near the onset of melt as described above, and drawing and calendering is accomplished by the application of 1) constant and controlled tension in the case of the drawing operation and 2) pressure with controlled tension in the case of the calendering operation at temperatures of between slightly below or above the onset of melt as previously described. Drawing is preferably performed at a temperature of between about 140° C. and about 158° C. and most preferably between about 148° C. and about 150° C. for commercially available UHMWPE compacted powders although variations in the UHMWPE

compositions utilized as starting materials may allow for alteration of these temperature ranges. At temperature levels below the previously defined ranges, no significant thickness reduction will occur, while at temperatures above these ranges the material will tend to separate in the drawing and calendering operations. Calendering can in fact be performed over a very wide temperature range with the calendering rolls being at temperatures from ambient to well above the actual melt temperature of the polymer depending upon such variables as equipment capabilities such as speed of calendering, pressure applied, etc. The only true limitation being that the compacted and drawn sheet not melt during calendering.

Maintaining a controlled tension of between about 0.5 and about 5 g/denier, and preferably between about 0.8 and 3 g/denier is also important to the production of product having the required "thinness" specified herein. Denier as used herein is defined as the weight in grams of 9000 meters of the product film, sheet or fiber, during drawing and calendering, is also highly important to the successful production of a suitable product having the required "thinness" specified herein. At tension levels below 0.5 g/denier no significant drawing or reduction will be obtained while at tension levels above about 5 g/denier the material will tend to separate. In the case of drawing, tension is a function of the feed polymer and can vary broadly depending thereon and the ranges just specified refer to shoes found useful with particular commercial starting materials. The UHMWPE films, sheets, fibers or tapes produced by the process just described exhibit heats of fusion at or above about 243 joules/gram.

Total reductions achieved during drawing and calendering will generally be between about 50:1 and about 170:1 or more depending again upon the input raw material and the end use to which the product is to be applied. Such total drawing and calendering is computed as the multiple of each of the individual reductions achieved by each of the combined process steps.

After thickness reduction by calendering and/or drawing in the apparatus shown in FIGS. 2 and 3 and according to the processing parameters just described, various additional operations can be performed to make the product suitable for the various product applications described below,

For example, as shown in FIG. 2, the drawing line or apparatus 10 may include a fibrillation roll or other apparatus for purposes of introducing short slits across the width of the product film, sheet or fiber. Fibrillation and the equipment used to produce it are both well known in the art and, in fact, were used in the prior art production processes. Fibrillation while often incorporated into the production lines for the materials described herein is not essential to the successful practice of the present invention. The tape, sheet, film or fiber output of the drawing and calendering processes can be slit to an appropriate width for the production of fibers and then subsequently fibrillated. As described below, special slitting treatments provide even more unique products.

As will be apparent to the skilled artisan, combinations of the calendering and drawing processes within the parameters described herein can easily be envisioned, and such combinations are intended to be within the scope of the appended claims.

As discussed hereinafter, the provision of smooth edges on the tape, sheet, film and fiber products described herein provides significant advantages over similar prior art products. The attainment of such smooth edges that result in many of the enhanced products described herein and the

US 7,348,053 B1

7

generally rectangular cross-section of such products can only be achieved using the slitting techniques described below. The use of conventional slitting knives as are used in the art in the production of, for example blown films, and as were used in the slitting portion of the prior art processes described above, while suitable for the production of fibers, sheets, tapes and films in accordance with the present invention have a major shortcoming in that they leave a serrated surface at the point of slitting. This serration can result in the generation of stress risers that weaken the laminates described hereinafter when they are applied in ballistic applications. Accordingly, it has been discovered that the use of heated slitting knives, heated to a temperature of above the melting point of the UHMWPE, i.e. above about 141°-142° C. must be used to provide an even or smooth surface suitable for use in ballistic structures and laminates. The application of the process just described in combination with slitting using heated knives results in the production of highly oriented ultra high molecular weight polyethylene slit film fibers, tapes, sheets and films that are of a generally rectangular cross-section and have smooth cut edges.

The production of laminated structures produced by laminating a plurality of layers of films or sheets of these materials either directly to each other or through the mechanism of an adhesive of one type or another, also provide products exhibiting desirable ballistic properties.

Referring now to FIGS. 4 and 5 attached hereto, FIG. 4 depicts a cross-section of a composite sheet material suitable for lamination in accordance with the present invention. As shown in FIG. 4 such a composite sheet 58 comprises a sheet 60 of UHMWPE material fabricated in accordance with the present invention having a layer of a sheet adhesive 62 laminated thereto. Such a sheet adhesive may comprise, for example, a layer of high density polyethylene having a thickness on the order of, for example 30μ, and exhibiting a melting point lower than that of the UHMWPE so that no weakening of the UHMWPE occurs during subsequent lamination operations as described below. Exposure of the UHMWPE sheet may result in diminution of the ballistics properties thereof. It is to be noted that, while a sheet adhesive forms one preferred embodiment of a method of joining sheets of UHMWPE in the laminated fabrics described below, other adhesive materials capable of joining alternating sheets of UHMWPE may be substituted therefore. These include for example vinyl ester adhesives, flexible epoxies etc. that could be similarly used. In point of fact, fabrics of alternating layers of the UHMWPE materials described herein can be laminated without adhesive by the simple step of applying even relatively low pressures of from about 5-10 psi up to over 150 psi while heating layers of the UHMWPE sheet to a point near the softening point of the material or about 152 degrees C.

FIG. 5 depicts a cross-sectional view of a laminated structure or panel 68 fabricated in accordance with the present invention utilizing the laminated composite shown in FIG. 4. As will be apparent to the skilled artisan, it is highly desirable that the alternating sheets of UHMWPE 60 be cross oriented, i.e. be laminated in alternating directions due to the significant orientation of these sheets induced by the drawing and/or calendaring operations described above and the consequent relative directional character of their various properties.

The ballistic properties/performance of UHMWPE materials, in particular the gel spun versions of such materials produced by Honeywell International, Richmond, Va. and

8

sold under the trademark Spectra®, have been studied and reported widely. The ballistic performance of the materials described herein that can be produced at a significantly lower cost than the gel spun Spectra® fibers will be about equivalent to these prior art UHMWPE materials, but available at significantly lower cost due to the significantly reduced cost of their production. The strain rate sensitivity of these materials, i.e. their property of becoming stronger the faster strain is applied thereto, makes them particularly useful in ballistic applications where large strains are applied very quickly by an incoming threat.

Ballistic panels as claimed hereinafter are fabricated as just described by laminating a plurality of layers of the sheet/films described above, preferably in alternating orientations, and, of course need to be self-supporting in order to be practical for use as ballistic containers, buildings etc., i.e. closed structures, capable of withstanding ballistic forces whether addressed from within the structure (containment) or outside of the structure (protection). Self-supporting panels suitable for the construction/assembly of ballistic structures are generally, but need not be, above about ¼ inch and preferably above about ½ inch in thickness to provide basic levels of ballistic resistance and at least minimal structural strength when appropriately assembled into a container or building in a conventional fashion. There is no practical upper limit to the thickness of such panels except as may be imposed by the particular application or the ability to fabricate a certain thickness.

While it is theoretically possible to fabricate the ballistic panels described herein from the tapes or slit film fibers described hereinabove, it is probably cost prohibitive to do so, but such ballistic panels fabricated from these starting materials are intended to be within the scope of the appended claims.

There have thus been described a novel class of laminates made from UHMWPE slit films, tapes, or sheets that can be fabricated into laminated panels suitable for the construction of protective or containment structures.

As the invention has been described, it will be apparent to those skilled in the art that the same may be varied in many ways without departing from the spirit and scope of the invention. Any and all such modifications are intended to be included within the scope of the appended claims.

What is claimed is:

1. A ballistic panel comprising a laminated structure of a plurality of highly oriented ultra high molecular weight polyethylene slit film fibers having a generally rectangular cross-section and smooth cut edges and a heat of fusion above about 243 joules/gram.

2. The ballistic panel of claim 1 wherein said ultra high molecular weight polyethylene slit film fibers have a thickness below about 3 mils.

3. The ballistic panel of claim 1 having a thickness above about ¼ inch.

4. The ballistic panel of claim 3 having a thickness above about ½ inch.

5. The ballistic panel of claim 3 comprising a plurality of individual layers of a highly oriented ultra high molecular weight polyethylene slit film fiber laminated directly to each other without an adhesive mechanism.

6. The ballistic panel of claim 3 comprising individual layers of a highly oriented ultra high molecular weight polyethylene slit film fiber laminated directly to each other with an adhesive mechanism.

* * * * *